IN THE

# Supreme Court of Appeals

OF

# VIRGINIA.

## 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

THOMAS' ADM'R v. BETTIE THOMAS LEWIS AND ALS.

June 16th, 1892.

1. GIFTS CAUSA MORTIS—*Case at bar.*—Where a gift of personal property was made under apprehension of death as imminent, and possession was delivered, either manually or constructively, at the time of the gift, and remained with the donee until the donor's death, and the donor died of the same illness a few hours after making the gift, though the gift was of the donor's entire personalty, and the *factum* of the gift was proved by only one competent, credible witness, and the donor and the donee resided together at the time of the gift, and the possession was at their residence—

HELD:
    The gift was valid as a *donatio causa mortis*.

2. IDEM—*Construction of statutes.*—The words "*no gift*" in Code 1887, § 2414, refer not to, and the section does not embrace, *gifts causa mortis.*—LACY, J., *dissenting.*

3. IDEM—*National bank deposits.*—Where such a gift included a national bank pass-book, displaying the balance to donor's credit—

HELD:
    Insufficient to pass title to the deposit.—FAUNTLEROY, J., *dissenting.*

4. IDEM—*Duplicate keys.*—The fact that a donor, having duplicate keys to his depository of valuables, placed one set with a friend as a precaution, will not invalidate a gift *causa mortis* made by delivery of the other set.

5. IDEM—*Testamentary acts.*—The fact that a donor, in making a gift *causa mortis*, uses the words " to be yours in case of my death "—

HELD :

    Not to make the gift testamentary.

6. IDEM—*Evidence—Self-servient declarations.*—Declarations of donee and her companion as to the circumstances of the gift made the night before—

HELD :

    Admissible in donee's behalf as parts of *res gestæ* and in rebuttal.

Argued in Richmond.    Decided in Wytheville.    Appeal from decree of the chancery court of the city of Richmond, pronounced January 8, 1891, in the cause wherein Bettie Thomas Lewis and her husband were complainants, and W. R. Quarles and Mann S. Quarles, curators of the estate of William R. Thomas, deceased, and Legh R. Page, his administrator, were defendants.    The object of the suit was to recover the entire personal property of the intestate under the claim that he had made of it a donation *pro causa mortis* to her.    The chancery court by its decree sustained her claim, except as to the sum of eighteen thousand dollars, money on deposit in the Planters National Bank, which sum was awarded to the administrator.

From this decree the administrator obtained an appeal and writ of *supersedeas* from one of the judges of this court.

Opinion states the case.

*W. R. Staples, B. B. Munford, M. M. Gilliam,* and *G. W. Hansbrough,* for the appellant.

The first and the last named argued the case orally as well as by brief before this court.

## A Brief of Appellant's Counsel.

William A. Thomas died January 4th, 1889, intestate, and without ever having been married, leaving an estate of about $200,000 in personalty and $20,000 in realty.

With him, for some years before his death, resided a female mulatto named Bettie, whom he recognized as his natural child and treated with affection, and for whom he often expressed a purpose to provide, through the intervention of a trustee, a comfortable support, and with such design he had already conveyed to his friend, A. J. Watkins, as trustee, two houses and lots in the city of Richmond, and had got the consent of his physician, Doctor Hunter McGuire, to hold, as trustee, a couple of lots whereon he planned to erect houses. But he had never expressed an intention to give her his whole estate, nor the control of more than the income of any part of it.

On the contrary, her own witness, Dr. McGuire, in answer to cross-question 12, record pp. 227–'8, said : "Mr. Thomas was very earnest in his intention for Bettie to have a trustee. He recognized her unfitness to take care of her own property. He thought she might become a prey to other people. He wanted the property he left her so fixed that she couldn't spend more than the income. From repeated conversations with him I gathered that he had no idea of leaving her all of his property. He wanted to leave her a comfortable support. He said to me : 'Her color, her education, her social condition—all would make it unwise for him to leave her a large sum of money.' "

Bettie was the childless wife of a negro named John H. Lewis, who mostly stayed in Washington city, and towards whom "Thomas was bitter."

Thomas said to Watkins (see answer to question 10, record

p. 278): " What you hold in trust for her is sufficient, but I may make over other property to her later"; adding, " they would get it from her."

Mr. Thomas thought a good deal of his relatives, C. T. Thomas and Ben. Gravely. Of the latter he wrote: " I have always loved him as a brother." He kept Gravely's portrait over his mantel.

On Thursday, the 3d of January, 1889, Mr. Thomas was taken-ill. Dr. McGuire called that night. Seeing his condition, next day he arranged with Thomas to send Mr. Gilliam, a lawyer, to prepare his will. Mr. Gilliam came and made an appointment with Thomas that he should come the next day (Saturday) to his (G.'s) office and make his will. Record, p. 282. About 8 P. M. Friday Dr. McGuire again called, and asked if Mr. Gilliam had been there. Thomas answered, " Yes," and waved his hand, saying: " That's all right, Doctor." The latter replied: " I am glad you have done it; you have only done justice." To which Mr. Thomas responded: " You will be well satisfied with what I have done." The doctor (in his deposition, answer to 11th question, record, p. 223,) adds: " I thought he had made his will, so far as his daughter was concerned."

We here insert from record, p. 224, four questions and answers—to-wit, 19th, 20th, 21st, and 22d—of the direct examination of Dr. McGuire, which were objected to by the defendants' counsel as illegal:

19th question. " Do you remember that morning at your office Fannie telling you about Mr. Thomas having given his property to Bettie the night before ? "

Answer. " No, I do not."

20th question. " Do you remember, when you got to Mr. Thomas' that morning, whether Bettie told you that her father had made that gift to her the night before, and what your reply was ? "

Argument.

Answer. " Yes, Bettie told me, after I got in the house, that her father had given her his keys, his bank-book, and papers. As far as I can recollect, I think she told me she had put them in the top bureau drawer. She told me that he had given them to her. They were *to be hers.* I told her, ' They were not worth a cent ; that unless he made a will the law would give her nothing.' That is about the substance of our conversation, as far as I can recollect."

21st question. " Did she say when he had given them to her ? "

Answer. " I don't think she did. I don't remember."

22d question. " Had you ever heard of a gift *causa mortis ?* "

Answer. " No."

Mr. Thomas had appointed Saturday to go to Mr. Gilliam's office and make his will, but he did not live to keep the appointment. He died about 10:30 that Friday night.

Bettie then sent for her trustee, Mr. Watkins. He came about midnight. She told him there was no will, because, had he lived till to-morrow, he was going to Mr. Gilliam's office to make his will, and that as there was no will she supposed all she would have was the property given him (Watkins) as trustee for her. She did not intimate to him that her father had given her his money, bank-book, securities, or his safe at Drewry & Co.'s.

On 22d February, 1890, she made the affidavit on record pp. 64–'5, wherein she says : " Just before her father died he called her to him, and gave her his bank-book, two pocket-books, certain negotiable notes which he then had with him, and the keys of his safe at the office of Drewry & Co. ; the money in the bank, represented by his bank-book, and the money and papers and property in the safety-deposit box in the bank vault *were hers in case of his death,*" &c.

This affidavit, and those of Fannie Coles and others, were

filed by Bettie Lewis in the court below in support of her motion for the appointment of a receiver.

Fannie Coles is a mulatto woman, who had for five years been living at Mr. Thomas' as a companion for Bettie. In her affidavit she said : " She was present at the time of the gift by W. A. Thomas to his daughter, Bettie T. Lewis, of his bank-book, some negotiable notes, and of the keys of his safe at Drewry & Co.'s, two pocket-books, and of his safety-deposit box in the vault of the Planters National Bank of Richmond ; that at time of said gift said Thomas explained to his daughter the general character of the papers, &c., in his safety-deposit box in the bank vault, and the importance of the same ; that he told her the contents of the box, the contents of the safe at Drewry & Co.'s, the negotiable notes then handed her, the amount in the bank represented by his bank-book, *were to be hers in case of his death ;* and that he then delivered the said keys, bank-book, and papers to her, and told her to put them in her trunk, and not to let anybody have them ; * * * and that he was then in his right mind, but that he was apprehensive that he would then shortly die."

Bettie Lewis did not depose in this case. But this Fannie, whose testimony is the sole reliance to establish the pretended *donatio causa mortis* whereby Bettie Lewis claims the bulk of the intestate's estate, did depose, and her deposition occupies sixty pages of the printed record. See pp. 162 to 222.

She testifies with surprising minutiæ of detail that on three occasions, Thursday night, Friday afternoon, and Friday night, she was present when Mr. Thomas gave to Bettie his keys to his safe at Drewry & Co.'s, and to his box in the vault at the bank, and his papers, money, and property therein, and his two pen-knives, his two pocket-books and their contents, his bank-book and the money represented by it, and some negotiable notes he then had with him, and told her *they were hers ;* that on Thursday night all these things, except the

negotiable notes, were present, and delivered by him to 'her, with instructions that she put them, not in his bureau, but in her own trunk ; that, nevertheless, she did drop them into his bureau drawer.

With even more circumstantiality she narrates that Mr. Thomas, after Mr. Gilliam had left him, was taken worse about 3:30 Friday afternoon, and told her to take a seat near the table, and asked Bettie where were the things he gave her last night, and she answered that they were safe, and he told her to bring them to him. She got them out of the bureau where she had put them, and he got very angry with her for putting them in his bureau. Bettie brought the things, including the negotiable notes, and he took them up one by one, explained what they were, gave them to her, saying as to each, " It is yours," and enjoining it upon her to place them between her clothes in her trunk, lock the trunk, and bring him the key, which she did ; that he looked at the keys and said they would do ; that he directed her to keep her keys on her person night and day, and that he said to the witness : " Fannie, you see me give Bettie everything I possess in this world, didn't you ? " And that the witness answered : " Yes, sir ; I did." And that he then told her to remember it.

And finally this witness narrates a conversation which took place after Dr. McGuire's last visit, and a few minutes before the intestate's decease, between him and Bettie, wherein he enquired where were the things he had given her, and where her trunk keys were, and called on the witness to remember.

But the things were not present at that time. No full recital of the testimony of this witness is here attempted. Only the substance is given, so far as it pertains to the alleged gift *causa mortis.* But attention is called to the facts that on Thursday night Bettie did not accept the things given by taking possession, but left them in the donor's possession— that is, in his bureau drawer ; and that on Friday afternoon,.

when the witness states that he gave and delivered those things to Bettie, and Bettie put them in her trunk and locked it as he directed her, the donor was not in expectation of immediate death, as he had appointed the next day to go to the city to Mr. Gilliam's office, there to make his will; and to the conceded fact that at the time of the alleged gift and delivery both donor and donee resided together, and that the latter's possession was at the place of their residence.

Attention is also invited to the palpable and material variance between the affidavits of Bettie Lewis and of Fannie Coles, (sworn to 22d February, 1889,) from the deposition in chief of the latter, taken June 7th, 1889, and to the remarkable failure of that deponent to mention those words, " *were to be hers in case of his death,*" which stand out so prominent and conspicuous in both of said affidavits.

But it seems undeniable that the cross-examination did attract her thoughts to those words, and that in her answer she admitted that Mr. Thomas had used them in her presence in making the alleged gift to Bettie.

At the risk of tediousness, I quote cross-questions 151 to 158, inclusive, in order to verify my assertion :

Question 151. " Did you make any affidavit in this case ? "
Answer. " I did."

Question 152. " In whose handwriting is that affidavit ? "
Answer. " I signed my name to the affidavit. I don't know anything about the handwriting."

Question 153. " Look upon the paper now here shown you, and state if you signed that paper ? " See record, pp. 65–66.

Answer. " I did."

Question 154. " Who read it over to you before you signed it, or did you read it yourself ? "

Answer. " I think, as well as I can remember, Col. Allan read that paper to me."

Question 155. " Did you understand this paper fully when it was read to you ? "

Answer. " Yes, sir."

Question 156. " Look over it now. Have you examined it ? "

Answer. " I have read it over."

Question 157. " Do you believe the statements therein contained are correct ? "

Answer. " To the best of my knowledge, I do."

Question 158. " In that paper you say that ' at the time of said gift the said William A. Thomas explained to his daughter the general character of the papers, &c., in his safety-deposit box in the bank vault, and the importance of the same ; that he told her that the contents of that box, the contents of the safe at Drewry & Co.'s, the negotiable notes then handed her, the amount in bank represented by his bank-book, were to be hers in case of his death.' Did he make any such statement in your hearing to Bettie Lewis ; and, if so, at what time, and in whose presence ? "

Answer. " He did make such a statement to her in my presence ; told me to remember it at the time he gave her those things—Thursday night—and in my presence on Friday afternoon ; Friday night again."

Now as to "the keys." An inspection is asked of the terms of the contract in writing, signed by Wm. A. Thomas, and found on pages 268–'9 of the record, whereby he leased the safety-deposit box in the vault of the Planters National Bank, and in which he kept his securities, &c., the keys to which Fannie Coles says he gave to Bettie Lewis. Note the terms. Especially observe clause 2d, where it is stipulated that " no one but the renter or agent, to be designated in writing on these conditions, or, in case of death, the legal representative, shall have the privilege of unlocking and opening said apartment." See also deposition of M. S. Quarles, record, pp. 254–'5, where he says that by the rules of the

bank no one but the renter, or some one authorized in writing, would have been permitted to have access to the said box, although the person applying might possess and exhibit the keys to the same.

Another circumstance important in the history of this case must not be omitted—to-wit, the duplicate keys Mr. Thomas possessed to the vault box, and to the safe, which were left by him in the care of his friend and agent, S. B. Hughes, and which were in his care at the time of the alleged gift, and up to the time of Mr. Thomas' decease, and all the while subject to his command.   See Hughes' deposition, record, pp. 151–'2.

By its decree of January 8th, 1891, the court below adjudged that the intestate, by a valid gift *mortis causa*, gave the complainant all the bonds, notes, stocks, securities, and other property claimed by her in·her bill, except the money on deposit to his credit in the Planters National Bank, holding that the delivery of the pass-book was not sufficient in law to constitute a valid *donatio causa mortis* of the money deposited.

From this decree the intestate's administrator appealed.

His counsel submit that the decree is erroneous, and assign several errors.

*First assignment.*

The alleged facts whereon Bettie Lewis (complainant below, appellee here) bases her claim have not been established by such proof as the policy of the courts in this state requires.

1. The proof demanded must be the clearest and most convincing, though the concurrent testimony of five witnesses is not here (as under the civil law) insisted upon.

I do not intend to analyze the testimony, or to criticise it minutely.  That has been done by abler pens.

In this case the allegations relied on are testified to by only one witness (Fannie Coles), whose testimony is certainly not beyond suspicion of bias and falsehood.   Her origin, her

rearing, her condition in life, and her relations to the complainant, are surely not such as entitle her to full credit as a witness. Herself a pariah of mixed blood, reared under the ban of social ostracism, a school teacher disabled to pursue her occupation by broken health, a companion, a dependent parasite and hanger-on of Bettie Lewis, her fetcher and carrier and doer of chores and errands, going and coming at her beck and nod, reliant for shelter and food upon her favor, and upon her success in this litigation for a future home—how can her evidence be depended on by this court, acting with its customary caution and judicial prudence, in determining an issue involving over $200,000, where her friend, host, and patron is vitally concerned ?

2. The tale she tells is, under the circumstances, wholly improbable and incredible.

(*a*) Her story predicates in Mr. Thomas a knowledge of the niceties of the doctrine of gifts *causa mortis*—a doctrine almost entirely unknown to the laity, and (then at least) not thoroughly known to the legal profession generally in this state.

(*b*) It supposes that Mr. Thomas, who in the record is said to be " close, just, and honest," was acting hypocritically and deceitfully to his trusted friend, and physician, and attorney, Watkins, McGuire, and Gilliam, in assuring them that he meant to give his illegitimate daughter only a comfortable support through the intervention of a trustee, so fixed that other people (including her husband, " of whom he did not think much, and towards whom he was bitter,") could not get it from her ; and that, in order to effect such end, he would make a trust deed, or his will, and at the instance of McGuire he had actually made an appointment with his attorney to come to his office and make his will, all the time concealing his (attributed) acquaintance with gifts *causa mortis*, and the fact that he had already essayed to make her such a gift, and

intended to repeat the attempt.    Such a story is inconsistent with other known and controlling facts.

(*c*) Had Mr. Thomas been conversant with the mode of transferring property by gifts *causa mortis*, and relied on such method to make provision for the daughter, to whom he was so much attached, presumably he would have known that his actings and doings in such behalf would have to be established by proof that would be satisfactory to the court.    And is it probable that, with such knowledge of the necessity of satisfactory evidence, he, a man of acknowledged sense and prudence, and in his right mind, would. have trusted his beloved daughter's gift of over $200,000 to the memory, truth, and integrity of this woman alone, when he could so easily have had as his witness Dr. McGuire, who found him two hours before his death clothed and in his right mind, sitting up in a chair reading a newspaper, and whose testimony (he was well aware) would be received implicitly as unquestionable truth by courts and public ?

Is it not incredible that he would not have then said : " No, Doctor, I have made no will.    There is no necessity for a will.    Last night, and again this afternoon, I gave to Bettie everything I possess in this world " ? as he is said to have told Fannie Coles.    Or, if he was as well posted as he seemed to be, and was aware of the necessity of proving the delivery of the things given by an eye-witness, why did not his common sense and prudence induce him to go through the ceremony of the gift and delivery again, and call on the Doctor to remember, as he had called on Fannie ?

Or, better still, instead of handling and untying packages, and removing strings and tissue paper from keys, and going through a half-hour's harangue, as Fannie Coles testifies he did, why did he not take his pen and write the half a dozen lines of holograph will which he must have known would suffice, after his death, irrevocably to vest in Bettie, not only

his money in bank, the negotiable notes, and the contents of his safe and safety-deposit box, but also to make true *the false* words which Fannie Coles repeatedly puts into his dying mouth : " Now, Fannie, you see me give to Bettie *everything I possess in this world.*" And yet she was too well posted to pretend that he had given her his real estate, or even the house wherein they were all then residing together, which real estate was worth over $20,000, and which was surely not forgotten by this careful old man, who even, *in extremis*, remembered to make a special gift of his two pocket-knives, and to urge Bettie " not to let anybody steal them from her." And why did not one of them say to Mr. Thomas whilst he was going through with this farce : " Dr. McGuire told us this morning that all this is not worth a cent unless you make a will ? " It was unnatural and improbable that on such a momentous occasion these women's tongues should have remained so still. But did such occasion ever occur ? The whole story of a *donatio causa mortis* seems to be a fabrication founded on some directions to Bettie to take care of those things, which directions were probably exaggerated and put into shape subsequently by some more skilful manipulator.

(*d*) If this court entertains a doubt as to the satisfactoriness of the testimony, of course it will not sustain the complainant's claim.

Besides the aforesaid ground of suspicion and doubt, I make bold to ask, Is not the variance between the affidavits of Bettie Lewis and Fannie Coles on the one hand, and the deposition of the latter on the other, a most pregnant source of doubt and suspicion ? If Mr. Thomas used the words of the affidavit, and did say to Bettie, " these things were to be hers in case of his death," then it was not a gift *causa mortis*, but a testamentary act, and her claims cannot be sustained. If Mr. Thomas did say anything of the sort, the probabilities are that he did say, (as the affidavits say,) those things " were

to be hers in case of his death.". "Absolute gifts in the donor's lifetime are not to be presumed. '*Nemo donare facile presumitur*' is the maxim of the law applicable to the case; the presumption being against it, clear proof on the part of the claimant is required." *Dickeschied* v. *Bank*, 28 W. Va., p. 361.

True, this witness in her deposition, taken several months later, omits those words which show that the donor did not intend the gift to take effect during his lifetime; and this witness used only the words " were hers," so as to make the gift *in presenti* and valid according to the doctrine of gifts *causa mortis;* which change was probably an after-thought and the result of careful coaching by some friend of the complainant. Please note here that Dr. McGuire, in his deposition, answering 20th question-in-chief, record, p. 224, says : " Bettie told me her father had given her his keys, bank-book, and papers. \* \* \* They *were to be hers.*" And the presumption is that the affidavit, and not the deposition, is correct. See the words of Allen, J., in *Miller* v. *Jeffress*, 4 Gratt., p. 476 (quoted elsewhere in this brief): " As to the precise words used by the decedent, the certificate written and signed at the time, and referred to and recognized by the witnesses when giving their testimony, can be more safely relied on as showing what did actually occur than the recollection of the witnesses after so long a time."

Does not this material variance afford ground for doubt and suspicion as to the veracity, or, at least, as to the reliability of Fannie Coles ? And is this doubt reconcilable with that clearness and convincingness of the proof on which this court does habitually act in such cases ?

(*e*) The court below in its opinion alludes to the circumstance that the appellant (defendant below) did not introduce evidence of general character to impeach this witness, or " to contradict her as to particular facts."

As to general reputation, her testimony shows that her life had probably been spent too remote from respectable people to be either assailed or defended by reliable witnesses. And as to contradicting her, that was next to impossible as to the principal facts, because they all occurred in the presence only of Mr. Thomas, who of course could not, and of Bettie Lewis, who of course would not, contradict the witness on whose sole testimony she staked her game. But as to other declarations, please compare her deposition with those of Dr. McGuire and Mr. Watkins, and note many material discrepancies, which are discussed by Judge Staples in his admirable brief. And we contend that Fannie Coles stands impeached as a witness not only by contradiction by those two gentlemen, and by the statement of Bettie Lewis to Watkins on Friday night, that if there was no will she would have nothing but what was given to him as trustee for her, (record, p. —,) but also by the inherent improbability of her testimony.

The court below attributes to her the utmost credit, solely on the general presumption of innocence and truth, which the law in its benignity theoretically ascribes to all *disinterested* witnesses, in the teeth of the dictum of Scripture that " all are liars."

But it is undeniable that courts of the highest resort are constantly holding that " the uncontradicted evidence of interested witnesses to an improbable fact does not require judgment to be rendered accordingly." Such was the ruling of the Supreme Court of the United States in *Quock Ting* v. *U. S.,* 140 U. S. Rep. 417, where Mr. Justice Field, speaking for the court, on p. 420, said : " There may be such an inherent improbability in the statements of a witness as to induce the court or jury to disregard his evidence, even in the absence of any direct conflicting testimony." See, also, *Kavanaugh* v. *Wilson,* 70 N. Y. 177, 179 ; *Kochler* v. *Adler,* 78 N. Y. 287 ; *Elwood* v. *W. U. T. Co.,* 45 N. Y. 549, and *Wait* v. *McNeil,* 7 Mass. 261.

And being thus impeached, it then became incumbent on the complainant to corroborate her testimony by evidence to sustain her general reputation for veracity. And true it is the complainant did attempt to sustain and fortify her, not by proof of general reputation (for that was too dangerous a venture), but by proof of some statements made by the complainant and this witness to Dr. McGuire Friday morning, and to Mr. Hughes Friday night, which were objected to, and will be animadverted upon as self-servient and hearsay.

(*f*) Not only the improbable nature of the tale she told, but her extraordinary minutiæ of detail and wonderful circumstantiality, coloring, and hyperbole afford indications of more fertility of invention than of accuracy of recollection; and as Lord Hardwicke said in *Ward* v. *Turner*, 2 Ves. Sr. 431, of a witness that was used there by the plaintiff to sustain his claim to a *donatio causa mortis*, such minutiæ of detail and circumstantiality of narration " argue a very strong memory or a pretty strong assurance in swearing." And he must have thought there was more of the latter quality than of the former, as he did not credit the witness' testimony, but said : " If I was to ground my opinion upon any objection in point of fact, I should not determine it, but send it back to be tried by a jury." And for argument's sake admitting the facts to have been proved as alleged, he proceeded to decide the cause, upon the law, adversely to the plaintiff.

*Second assignment.*

If this court should deem the alleged facts to have been established with the requisite satisfactoriness, then the appellant submits that those facts are insufficient under the laws of Virginia to constitute a valid *donatio causa mortis*.

*The law of the case.*

The following propositions are familiar and settled law in Virginia :

If one chooses to die intestate, the statutes of descents and distributions make a just and wise distribution of his estate.

Argument.

If he prefers a different disposition, the statute of wills affords him a safeguard against imposition *in extremis.*

By the civil law, as well as by the common law, he is allowed to make parol gifts of his personalty, whether as to things in possession or things in action. *Lee* v. *Boak*, 11 Gratt., on p. 186.

Gifts are of two kinds: (1) Gifts *inter vivos;* (2) gifts *causa mortis.* 2 Kent's Com. 565 ; *Barker* v. *Barker*, 2 Gratt. 348 ; 3 Lawson's R. R. & P., § 1324; *Dickeschied* v. *Bank*, 28 W. Va. 357 ; 3 Pomeroy Eq., § 1148.

The civil law permitted one in expectation of death to make of personalty a gift *causa mortis.* Such, however, was the apprehension of fraud and consequent jealousy of such gifts, that by the Code of Justinian the concurrent testimony of at least five witnesses was required to establish it.

The common law, too, suffered these gifts, and did not designate the number of witnesses ; but, regarding them with extreme suspicion, demanded the clearest and most convincing proof of compliance with all their requisites. *Yancey* v. *Field*, 85 Va. 760 ; 3 Pom. Eq., § 1146 ; 3 Lawson's R. R. & P., § 1332 ; *Hatch* v. *Atkinson*, 56 Maine 324 (96 Am. Dec. 464); *Gano* v. *Fisk*, 43 Ohio St. 462 (54 Am. R. 819); *Hall* v. *Howard*, Rice (So. Car.) 310 (33 Am. Dec. 115); *Seabright* v. *Seabright*, 28 W. Va., on p. 482. Ch. Kent (2 Com., p. 576) said : " Gifts *causa mortis* amount to a revocation *pro tanto* of written wills ; and, not being subject to the forms prescribed for nuncupative wills, they are of a dangerous nature."

Wills, by the Virginia statute, must be in writing, signed or acknowledged by the testator in the presence of at least two competent witnesses present at the same time and subscribing in the presence of the testator; whilst *nuncupative* wills are confined to soldiers in actual service and sailors at sea.

The only difference between these two kinds of gifts is that there is in gifts *causa mortis* an inherent revocability during the donor's lifetime.   Lewis, P., in *Yancey* v. *Field*, 85 Va. 760, said: " The only difference between a gift *inter vivos* and a gift *causa mortis* is that the latter is made under apprehension of death, and to it certain implied conditions subsequent are annexed, upon the happening of any one of which the donation is defeated ; that is to say, it is defeasible (1) by actual revocation by the donor in his lifetime ; (2) by the donor's surviving the apprehended peril ; (3) by his outliving the donee, and (4) by the occurrence of deficiency of assets to pay the donor's debts.   In other respects these gifts stand on the same footing."   1 Lomax Ex. 497 ; 3 Minor's Insts. (Lith. Ed.) 226.

Mr. Justice Matthews, in *Basket* v. *Hassell*, 107 U. S., on p. 610, referring to the conditions subsequent mentioned by Lewis, P., said : " These conditions are the only qualifications that distinguish gifts *mortis causa* and *inter vivos*."   In fact, " gifts " is the name of the *genus*, whilst gifts *inter vivos* and gifts *causa mortis* are the names of the species.

In case of either kind of gifts there must not only be an intention to give, but an actual tradition of the thing given. *Ward* v. *Turner*, 2 Ves. Sen. 431 ; 1 Leading Cases in Eq., p. 1205 and notes ; *Seabright* v. *Seabright*, 28 W. Va. 471. Green, J., in *Ewing* v. *Ewing*, 2 Leigh, p. 343, said : " *No parol gift*, without actual delivery of the thing given, can vest in the donee any right or title in the thing given, or divest the right or title of the donor.   This is unquestionably settled as the common law."   On p. 344 he said : " If the subject of the gift be incapable of delivery, it cannot be given by parol, but must be transferred by some writing and a delivery of the writing."   Similar remarks were made by Carr, J., on p. 341, in the same case.

In *Miller* v. *Jeffress*, 4 Gratt. 479, Baldwin, J., delivering

the opinion of the court, said: " A delivery is indispensable to the validity of a *donatio causa mortis*. It must be an actual delivery of the thing itself, as of a watch or a ring, or the means of getting possession and enjoyment of the thing, as of the key of a trunk or of a warehouse where the subject of the gift is deposited; or if the thing be in action, of the instrument by using which the *chose* is to be reduced into possession, as a bond, or a receipt, or the like."

Mr. Minor, in his 3d Vol. Insts. (Lith. Ed.), p. 222–'3, (following the text of Lomax Ex., 463–'4), says: " The general rule requires an actual delivery of the thing to substantiate the gift   *   *   *   ; where the nature of the thing is capable of corporeal delivery, such delivery is never dispensed with   *   *   *   ; where the nature of the thing is incapable of corporeal delivery, the delivery of the means of getting possession or making use of the thing will suffice—as of a writing—of a key of a trunk or warehouse; not that the key or the writing is a symbol of delivery—symbolic delivery " (one thing for another) " being always insufficient."

Delivery must be made according to the nature of the thing given, and not according to the capacity of the donor at the time of the gift to make delivery. *Turner* v. *Brown*, 6 Hun. 351.

" The delivery must be such as thereby the donor parts with all control and power of exercising dominion over the thing given, and such as confers on the donee the *present exclusive* power of taking physical possession thereof." 3 Pom. Eq., § 1149; 3 Lawson's R. R. & P., § 1329, Lacy, J., in *Sterling* v. *Wilkinson*, 83 Va., p. 787, and Lewis, P., in *Yancey* v. *Field*, 85 Va., p. 762.

All gifts, whether *inter vivos* or *causa mortis*, are gifts *in presenti*. There must be words of *present* gift as well as delivery. The one without the other is insufficient. Though there be actual delivery, yet if the words of gift accompany-

ing the delivery indicate an intention on the part of the donor not to confer on the donee the power of taking physical possession of the thing *until the donor's death*, then the proceeding is an abortive testamentary act and not a gift. *Basket* v. *Hassel*, 107 U. S. 602, is an illustration and authority in point. H. M. Chaney held a certificate of deposit in the Evansville National Bank of $23,514.70. During his last illness, when apprehensive of death, Chaney made and signed the following endorsement upon the certificate, and delivered it to Martin Basket, and died—to-wit: "Pay to Martin Basket, of Henderson, Ky.—no one else—then not till my death. My life seems to be uncertain. I may live through this spell. Then I will attend to it myself." *Held*, that "Basket by such endorsement and delivery acquired no title to or interest in the fund."

Mr. Justice Matthews, delivering the opinion of the court (pp. 613–'14) said: "That a delivery of a certificate of deposit, such as that described in the record in this case, might constitute a valid *donatio mortis causa*, does not admit of doubt." \* \* \* Pp. 614–'15. "The certificate was payable on demand; and it is unquestionable that a delivery of it to the donee, with an endorsement in blank, or a special endorsement to the donee, or without endorsement, would have transferred the whole title and interest of the donor in the fund represented by it, and might have been valid as a *donatio causa mortis*." \* \* \* P. 615. "But the transaction was entirely different. The endorsement which accompanied the delivery qualified it and limited and restrained the authority of the donee in the collection of the money, so as to forbid its payment until the donor's death. The property in the fund did not *presently* pass, but remained in the donor, and the donee was excluded from its possession and control during the life of the donor." \* \* \* "It was not a presently-executed gift *mortis causa*, but a testamentary

disposition." And not having been executed as prescribed by the statute of wills, was, of course, void.

And so likewise is the case of *Sterling* v. *Wilkinson*, 83 Va. 791, an illustration and authority in point.  There Irick delivered to Wilkinson certain bonds, which, in the writing evidencing the delivery, Wilkinson pledged himself *in case of his* (Irick's) *death* to divide equally between his wife and four daughters.  Lacy, J., pronouncing the opinion of this court, p. 797, said : "A delivery which confers on the donee power to control the fund *only after the death of the donor*, when by the instrument itself it is presently payable, is testamentary in character and not good as a gift."

In neither case does the court mean to say that the tradition itself of the things given was not sufficient, or could not have been sufficient, but that the words of gift accompanying the tradition qualified, and in fact nullified, the delivery and defeated the gift.  That is, that in either case the delivery of the thing without endorsement, or with a special endorsement to the donee, or with an endorsement in blank, would have sufficed to make the gift valid.  But in both cases the qualifying words accompanying the delivery rendered the gift invalid.

In the oft-quoted case of *Yancey* v. *Field*, 85 Va., p. 760, Lewis, P., says : " And because of the opening which this mode of transfer affords to fraud, the law watches it with jealousy, and does not permit it, with its attendant uncertainties, to take the place of wills.  Therefore, any gift which does not take complete effect by the transfer to, and acceptance by, the donee of the possession and title of the donor, in the lifetime of the latter, is testamentary in its character, and good only if made by will."  *Seabright* v. *Seabright*, 28 W. Va., p. 486.

The foregoing is recognized as the doctrine applicable to gifts of both species at common law.

All the Virginia cases referred to by Code revisors in note

to § 2414, all being cases of gifts *causa mortis* of *choses in action*, from *Ewing* v. *Ewing*, 2 Leigh 366, down to *Lee* v. *Boak*, 11 Gratt. 182, inclusive, arose and were decided under the common law, and before the passage of the act styled the statute of gifts, which went into effect July 1st, 1850.

The statute of gifts standing in the Codes of the states of Virginia and West Virginia, but (strange though it be) of no other state in this Union, has made some very important modifications in that doctrine. That statute embraces all gifts, whether *inter vivos* or *causa mortis*, of personalty, whether in possession or in action, and declares them invalid unless by deed (for gifts *inter vivos*) or will (for legacies, or the equivalent, gifts *causa mortis*), or unless *actual* possession shall have come to and remained with the donee, or some person claiming under him. And it further provides that such gift by parol and actual delivery shall not be valid where the donor and donee, at the time of the gift, reside together. Such is the plain meaning of the statute. Its language (Code 1887, § 2414) is:

"No gift of any goods or chattels shall be valid, unless by deed or will, or unless actual possession shall have come to and remained with the donee, or some person claiming under him. If the donor and donee reside together at the time of the gift, possession at the place of their residence shall not be a sufficient possession within the meaning of this section."

As early as 1757 an act was passed in Virginia declaring that no gift of a slave should be valid unless by will or by deed in writing duly recorded. In 1787 a proviso was added that that act should not extend to gifts of slaves which have at any time come into the actual possession of, and remained with, the donee, or other person claiming under him. Under the act of 1787 it was held by this court in *Durham* v. *Dunkley*, 6 Rand. 135, that the possession contemplated was "an actual, abiding, and permanent possession."

The act of 1850 amended the act of 1787, by inserting after the words, " no gift of a slave," the words " or of any goods or chattels." Surely, the insertion of these words cannot have altered the construction of the original act of 1787, whereby the possession contemplated by it was held to be " an actual, abiding, and permanent possession." But there was also the further amendment by the addition of the final sentence as it stands at present, and has stood since 1866, when the words " of a slave " were stricken out ; and as it stands now in § 2414, Code 1887, it has stood in the Code of West Virginia since 1868.

This section (2414), we repeat, includes all gifts, whether *inter vivos* or *causa mortis*, because " gifts " is the *nomen generalissimum*, and includes all its species. Gifts are so treated by all text-writers and by all judges in delivering the opinions of the courts, with only the qualification that the gift *inter vivos* is absolute from time of delivery, whilst gifts *causa mortis* are revocable and ambulatory until the donor's death. With this qualification they are the same.

The words " no gift " in that statute, then, mean " no gift," whether *inter vivos* or *causa mortis*, precisely as Green, J., in *Ewing* v. *Ewing*, 2 Leigh, p. 343, intended that the words " no parol gift " should mean " no parol gift, whether *inter vivos* or *causa mortis*." Then and there he was discussing an alleged gift of a bond. On p. 344 the same judge said : " The only difference between the *donatio causa mortis* and *inter vivos* is that the latter is absolute and unconditional, whilst the former is in contemplation of death, and subject, therefore, to the implied condition that the thing is to be restored if the donor recovers." Lewis, P., in *Yancey* v. *Field*, 85 Va. 756, said (as many others have) substantially the same thing.

And yet the court below (record, p. 342) said : "A gift *causa mortis* is a very different thing from a ' gift ' in many particulars."

And on the same page also said: " The policy of section 2414 originated in 1757 and 1787, and was applicable only to gifts of slaves, and obviously contemplated only gifts *inter vivos.* The Code of 1849 extended the policy to all goods and chattels, and it would do violence to reason and analogy to hold that in its new any more than in its ancient form it would embrace gifts *causa mortis.*"

But, it may be asked, what authority had the court below for its assumption that the acts of 1757 and 1787 were applicable only to gifts *inter vivos?* . Surely, before 1757 there might have been gifts *causa mortis* of a slave? Why not as well as of any other chattel? If not, what, then, did this court mean by holding in *Barker* v. *Barker*, 2 Gratt. 344, that " a parol gift of a slave, to take effect upon the death of the donor, *who is not then sick*, is not valid " ? Must it not have meant that if the donor had been sick at the time of the gift, and had died of the sickness, the gift would have been valid as a *donatio causa mortis ?*

It is true that the effect of the act of 1757 was manifestly to entirely abolish such gifts (*Spiers* v. *Willison*, 4 Cranch 398 ; *Ramsey* v. *Lee*, Id. 401), and, in fact, all parol gifts of slaves. But the effect of the act of 1787 was to restore such gifts, and, in fact, all parol gifts of slaves where " an actual, abiding, permanent possession " shall have been delivered thereof.

Yet the court below based, in part at least, its decision upon its construction of section 2414. And this fact must be my apology for my protracted dwelling upon a proposition which would seem so plain and palpable to the average intellect, and which this honorable court has apparently taken for granted in at least three cases determined by it during the last half dozen years—to-wit: That said section 2414 does apply as well to things in action as to things in possession, and to gifts *causa mortis* as well as to gifts *inter vivos.*

In *Lewis* v. *Mason*, 84 Va. 731, decided in 1885, a case of an alleged gift of a bond by a husband to his wife, donor and donee residing together, Fauntleroy, J., pronouncing the court's opinion, cited and quoted said section as appropriate to the question for decision. So, in *Yancey* v. *Field*, 85 Va. 756, decided in February, 1889, (a case of an alleged gift *causa mortis* of two bonds,) Lewis, P., cited the said section and gave the substance thereof as applicable to and decisive of the case before him, as follows : " Indeed, we have a statute which expressly enacts that no gift of goods or chattels shall be valid, unless by deed or will, or unless accompanied by actual possession, and that if the donor and donee reside together possession at their residence will not suffice."

And so, likewise, *Rowe* v. *Marchant*, 86 Va. 117, decided in June, 1889, (a case of an alleged gift *causa mortis* of certain bonds by Marchant to Rowe, who resided together,) Lacy, J., cited and quoted this § 2414 as pertinent to the issue under consideration.

This would appear to be decisive of the question. But this court has been reminded that the state of West Virginia carried into its Code of 1868 this section as it was enacted in 1849, with the words " of a slave " stricken out, and that in March, 1883, when the case of *Dickeschied* v. *Bank*, 28 W. Va. 340, arose, it remained, as it still remains, a part of the statute law of that state.

And as West Virginia and Virginia are the only states of the Union that have enacted such a statute of gifts, and as the said case of *Dickeschied* v. *Bank* plainly holds that said statute does extend to gifts *causa mortis* as well as to gifts *inter vivos*, its careful consideration is respectfully and earnestly solicited—the more earnestly because of the fact that the court below (record, p. 344) said : " If it " (meaning the Supreme Court of West Virginia) " did mean that the law " (said section) " applied to gifts *causa mortis*, it is,

in my opinion, an erroneous dictum, and I will not follow it."

In the case of *Dickeschied* v. *Bank, supra,* it was alleged that Dr. S. was in constant dread of death by assassination ; that he had some $8,000 in silver coin ; that on the day preceding his death by assassination he gave and delivered the coin to his favorite niece, Othelie Dickeschied, who did not reside with him, by delivering it to Mr. Dickeschied, her father, who did reside with the donor.

The court, after alluding to the Virginia statutes of 1757 and 1787, quoted the statute of 1850, and stated that the principal object the legislature had in view in passing that act was to protect the estates of decedents from the rapacity. of unscrupulous attendants residing with them, and said where the donee resides with the donor so many opportunities of unfair dealing may be found, and so many temptations to commit perjury may exist, the legislature determined to render the same impossible by declaring that no gift of goods or chattels should be valid, unless actual possession shall have come to and remained with the donee, or some person claiming under him. And if the donor and donee reside together at the time of the gift, possession at the place of their residence shall not be sufficient possession within the meaning of this section.

And the court further stated that if such was the purpose of the legislature, and persons, whilst residing with the decedent, could be permitted to obtain possession of his estate and claim title thereto as a gift made to and held by them as agent of some party *not* residing with the donor, the statute would be wholly ineffectual; and that had Othelie Dickeschied been residing with Dr. S., and the gift had been made directly to her, it would, under section 1; chapter 71, (of the West Virginia Code of 1868, which is the same as the Virginia, § 2414,) have been invalid, for want of sufficient delivery; and that if possession at the place of donor's residence, by an

agent of the donee residing with donor, could render valid a gift which, if made under the same circumstances directly to the donee, would be invalid, the provision of the statute would be insufficient to suppress the evil which it was intended to prevent; and that " the case under consideration affords the best illustration that can be presented of the mischief intended to be prevented by this statute.".

It appears incomprehensible how any one, whether jurist or layman, who has read the case of *Dickeschied* v. *Bank* can deny that the Court of Appeals of West Virginia meant to hold that the said statute pertained to and embraced gifts *causa mortis* as well as gifts *inter vivos*, and that the decision confirms the decisions of this honorable court in the three cases already cited.

In conclusion of this resume of the law of this case, I beg leave to quote some remarks of Allen, J., in *Miller* v. *Jeffress*, 4 Gratt., on p. 474, in reference to variances between affidavits at the time and subsequent testimony of the same persons, where he said : " I think that as the witnesses examined to prove the alleged donations vary somewhat as to the precise words used by the decedent, the certificate written and signed, and referred to by the witnesses when giving their testimony, can be more safely relied on as showing what did actually occur than the recollection of the witness after so great an interval. The facts, as set out in the certificate, and I may add as proved by the witnesses, satisfy me that the decedent had no idea, at the time, of parting with all dominion over the subject. When a man in his last illness attempts to dispose of his property, it is *prima facie* a testamentary act, unless the contrary be clearly shown. So far from that being the case here, the words themselves import a future benefit. ' That his friend, Jeffress, should have all the bonds of his in his possession,' imply not a present donation, but a future enjoyment," &c.

And now let us apply the law to the facts. And

*First—The common law doctrine.*

1. There must be actual delivery of the thing given or of the means of obtaining possession or use thereof.

Thursday night the things were left by the donee in the donor's possession—in his bureau drawer. Hence there was no valid *donatio causa mortis.*

Friday night the things were not produced, and hence there is no pretence of delivery then.

Friday afternoon it is claimed that the negotiable notes, the pocket-books, the pocket-knives, the bank-book, and the keys to the safe, and also the keys to the safety-deposit box, were delivered to the donee, who put them in her trunk.

Considering these things all as chattels, the delivery and acceptance thereof was sufficient at common law to create a valid gift either *inter vivos* or *causa mortis.* But the delivery of none of them sufficed to make a symbol for anything else, as " symbolic delivery is always insufficient."

(1) The delivery of the bank-book, whilst effectual to make a valid gift of the book itself, was insufficient to make a valid gift of the money in the bank ; because by the delivery of the bank-book Mr. Thomas did not part with the power of exerting dominion over the money in bank, which, notwithstanding the delivery of the bank-book, he was still at liberty to check out at will. Had it been a savings bank pass-book, or a certificate of deposit, on presentment whereof the amount represented thereby becomes payable, it might have been otherwise. And such delivery was also insufficient for such purpose, because the possession of the pass-book could not enable the donee to obtain the possession or use of the money in bank.

(2) Nor was the delivery of the keys to the safety-deposit box effectual to make a valid gift of the contents of the box, though effectual to make a valid gift of the keys themselves ;

because the delivery of the keys could not operate as a symbolic delivery of those contents, " a symbolic delivery being always insufficient " ; and because the possession of said keys would not enable the donee (though exhibiting them) to obtain access to the box and its contents during the donor's lifetime, or at all at any time, as the terms of Mr. Thomas' contract of lease of the box and the rules of the bank forbade any one to have access to said box except during banking hours, and Bettie Lewis did not receive the keys until after banking hours of the Friday on which Mr. Thomas died ; and as the terms of said contract and the rules of the bank forbade it to permit any one (though exhibiting said keys), except Mr. Thomas himself, or some one designated by him in writing, or his personal representative in case of his decease, to unlock and open said box.

(3) On another ground, also, the delivery of said keys did not make a valid gift of the contents of said box or of said safe. Mr. Thomas, besides the keys to said box and to said safe which he delivered Friday afternoon to Bettie Lewis, possessed duplicates of those keys, which were in the custody of his agent, Mr. Hughes, an officer of the bank, not to be used by Mr. Hughes, nor any one else save and except Mr. Thomas himself, or by some person designated in writing by him. These duplicate keys were retained by him in his possession and under his control at the time he delivered the set given to Bettie Lewis. Hence, it is obvious that after the delivery to her of the set he gave her, he could, either in person or by some one designated in writing by him, have got actual possession of the duplicate keys and unlocked and opened said box and safe and removed their contents. And so, it is manifest that the delivery of said keys which he gave to Bettie Lewis neither divested him entirely of the power of exercising dominion over the contents of said box and said safe, nor conferred on her the essential present exclusive right and

power of obtaining actual physical possession thereof—
*ergo*, the delivery of the keys which he gave to Bettie was
not such delivery as was sufficient to make a valid gift,
whether *inter vivos* or *causa mortis*, of the contents of said
box and safe.   Had some person *stolen* the keys given by him
to Bettie, and, on exhibiting them to the bank, been allowed
access to the box, and had removed the contents, the bank
would have been responsible for their loss to Mr. Thomas.
But otherwise, if such person had been armed with authority
in writing signed by him.

A check must be presented during the drawer's lifetime,
else the bank cannot cash it.   And so, where the means only
of obtaining possession and use of a thing given *causa mortis*
is delivered, the donee must obtain possession of the thing
during the donor's lifetime, else the gift is void.

2. In the case of all gifts, *inter vivos* or *causa mortis*, the
title of the donor must pass from him and vest in the donee
at the time of the gift; and a gift that is to take effect only
in the event of the donor's death is a testamentary disposition,
and therefore null and void.

The weight of the complainant's own evidence shows that
the gift of the said things was to take effect only in the event
of Mr. Thomas' death.   The affidavits of Bettie Lewis herself,
and of Fannie Coles, say that he gave these things to Bettie,
and they " were to be hers in case of his death."

Dr. McGuire, her own witness, deposes that Bettie told
him her father had given her his keys and his papers, and
that they *were to be hers*.   It is only in the deposition of
Fannie Coles, taken months later, that the phrase " were to
be hers in case of his death " is changed to the phrase " were
hers."   And the common experience of mankind confirms the
statement of Allen, J., (*ubi supra*,) that, " as to the precise
words used by the decedent, the certificate written and signed
at the time, and referred to and recognized by the witnesses

when giving their testimony, can be more safely relied on as showing what did actually occur than the recollection of the witnesses after so great an interval."

*Secondly—The statutory doctrine.*

The appellant, by his counsel, respectfully submits that this case is ruled by Code 1887, § 2414.* It reads:

"No gift of any goods or chattels shall be valid unless by deed or will, or unless actual possession shall have come to and remained with the donee, or some person claiming under him. If the donor and donee reside together at the time of the gift, possession at the place of their residence shall not be a sufficient possession within the meaning of this section."

This language is broad enough to cover the entire *genus* of gifts and all its species, which have been classified by text-writers into two—to-wit, gifts *inter vivos* and gifts *causa mortis.* And wherever the word "gifts" is uttered, whether by layman or legislator, jurist or judge, it is capable of embracing the entire family and all its members. And surely, when it is used by those who are versed as to the breadth of its legal signification, such as revisors of statutes and the law-makers of the state, it must be presumed to have been employed in its widest legal sense. By the common law all chattels (a word universally held to embrace all personal property either in possession or in action) were susceptible of being subjects of gifts *causa mortis.* A slave was a chattel. Why was not a slave, then, susceptible of being the subject of a gift *causa mortis?* He was certainly capable of being a gift *inter vivos.* The only difference between these two species of gifts is that gifts *inter vivos* are irrevocable, whilst gifts *causa mortis* are revocable during the donor's lifetime, though both are gifts *in presenti.* By the act of 1757 parol gifts of slaves were made invalid. By the act of 1787 the

---

*\*Donatio mortis causa.* 4 Gratt. 472; 23 Gratt. 342; 107 U. S. 602.—*Note of Code Revisor.*

proviso was added, to the effect that parol gifts of slaves were valid where actual possession thereof had come to and remained with the donee. So that under that act there might be a gift *causa mortis* of a slave if there was actual possession delivered to the donee. Under that act there must have been an, actual delivery, not a constructive or symbolic delivery, of permanent possession. In 1850 that act was amended by the insertion of the words " or any goods and chattels " after the words " of a slave." The construction remained the same, and still remains the same, though the act of 1850 was amended here, as in West Virginia, striking out the words " of a slave." So that, though occasionally through inadvertence there may have slipped into some opinion something to the effect that " the delivery may be actual or constructive," there has been no such judicial law-making as construes the word " actual " in that statute to mean " actual or constructive." Therefore, anything given must be actually delivered by the donor to the donee at the time of the gift; and if the thing given be incapable of corporeal delivery, then it cannot be given by parol, but must be given by deed or will. Thus a watch, a horse, a bond, or a note may be corporeally delivered. An open account debt, a balance to one's credit in bank, South Sea annuities, &c., cannot be so delivered, and therefore are not susceptible of being the subject of a parol gift.

But be this as it may, (for it is of no importance here,) to the act of 1787 the act of 1850, in order to settle certain grave questions that had arisen in our courts, added the clause : " If the donor and donee reside together at the time of the gift, possession at the place of their residence shall not be sufficient possession within the meaning of this section."

And the obvious effect of this addition is to abolish all parol gifts of either kind where the donor and donee reside together. In such case the gift can only be made by deed or

will. The object of the legislature manifestly was to protect the dying from the importunities and rapacity of unscrupulous attendants, and to prevent frauds and perjuries.

These propositions are sustained, in my humble opinion, by the authorities already cited. In fact, the very language of the section (§ 2414) appears to be so clear and unambiguous that it would seem that attempts to construe it tend rather to obscure than to eclaircise its meaning.

The application makes itself. In this case donor and donee both resided together, and the possession of the things given was at the place of their residence. Hence such possession was insufficient to constitute a valid gift *causa mortis.*

And the appellant respectfully submits that on this ground alone the decree complained of is erroneous, and should be reversed, and the complainant's bill dismissed.

*Third assignment.*

The court erred in admitting in behalf of the complainant evidence of statements made by herself and Fannie Coles Friday morning to Dr. McGuire, and to Mr. Hughes Friday midnight.

Dr. McGuire's testimony as to complainant's statements to him is on page 224 of the record, in answer to question 20 in chief.

Mr. Hughes' testimony as to her statements to him is on page 152 of the record, in answer to question 16 in chief.

The appellant submits that these statements were inadmissible, because they are self-servient and hearsay. A party is not entitled to make declarations and use them as evidence to promote his own interests. This is self-evident. 1 Greenleaf Ev., § 149 ; 1 Phil. Ev. 305.

" When the person whose words or acts are offered in evidence is also the opposite party to the suit, the evidence is inadmissible by virtue of another important principle—that no man shall be allowed to make evidence for himself." 2

Best on Ev., § 506. *Sprouse* v. *Commonwealth*, 81 Va. 374, is to the same effect.

The court below, however, insisted that the statements were admissible as part of the *res gestæ*. The *res gestæ* is the alleged gift *causa mortis*. "Declarations, to become part of the *res gestæ*, must have been made at the time of the act done which they are supposed to characterize; and have been well calculated to unfold the nature and quality of the facts they were intended to explain, and to so harmonize with them as to constitute one transaction." Greenleaf Ev., § 108, note 2.

Here the act mentioned to Dr. McGuire Friday morning had been done the previous night. The act mentioned to Mr. Hughes Friday midnight was done not later than 4 P. M. of that day. So the declarations were made several hours after the alleged act, and were not explanatory, but merely declaratory that the act had been done, and done, not by the declarant, but by Mr. Thomas.

In *Ward* v. *White*, 86 Va., p. 212, proof was admitted of insults published by the plaintiff the day before the injury done the latter by the former. On p. 217 Lacy, J., said: "The *res gestæ* are the undesigned incidents of a particular litigated act, which are admissible when illustrative of the act. These incidents may be separated from the act by a lapse of time more or less appreciable, but they must stand *in immediate causal relation* to the act," &c. The insults caused the attack upon plaintiff which was the act in litigation, and hence were admissible as part of the transaction. The declarations here stood in no such causal relation to the gift in litigation, but were " only a narrative of a past occurrence." 1 Taylor on Ev., § 589.

In *Haynes* v. *Commonwealth*, 28 Gratt. 942, prosecutor testified that immediately after being robbed he went to a house a few doors off and told occupant of the robbery. Court

below let him testify that he had told occupant he had been robbed, and let occupant testify that prosecutor had told him he had been robbed. But this court held those statements inadmissible. On p. 946 Christian, J., for this court, said: "Facts which constitute the *res gestæ* must be such as are so connected with the very transaction or fact under investigation as to constitute a part of it. Now the statement made by the prosecutor to Disney, after the larceny, was no part of the transaction under investigation, but was something that occurred afterwards, and was not so connected with it as to form a part of it. It was the prosecutor's narrative of a past transaction, and was mere hearsay. *Nor could such evidence be received for the purpose of corroborating the evidence of the prosecutor.*"

The last sentence serves to refute the second reason assigned by the court below for admitting said statements—to-wit: To support the credibility of Fannie Coles, which had been impeached by the contradiction of Dr. McGuire and of Mr. Watkins.

But Lewis, P., in pronouncing the opinion of this court in *Howard* v. *Commonwealth*, 81 Va., on p. 490, said: "There is no doubt that proof of declarations made by a witness out of court, in corroboration of his evidence in court, is, as a general rule, inadmissible"—citing *Oliver* v. *Commonwealth*, 77 Va. 590. And certain it is that these statements do not come within any exception to this rule; and that whatever motive might have influenced Fannie Coles to give a false or exaggerated deposition existed and operated on her mind at the time she made the statements, and had existed from the very time Mr. Thomas was attacked by the illness which carried him off. That motive was to acquire the decedent's large fortune for her patron, and to derive for herself the benefits she knew well would follow if success crowned her efforts. The quarry was then sprung and the pursuit begun.

*Edmund Waddill, Jr., Christian & Christian, Edgar Allan, W. W. Gordon,* and *E. C. Burks,* for the appellees.

The two last named argued the case orally before this court, and a brief* was filed for them all.

FAUNTLEROY, J., delivered the opinion of the court.

The petition of Legh R. Page, administrator of William A. Thomas, deceased, represents that on the 4th of January, 1889, the said William A. Thomas died intestate, leaving an estate valued at some two hundred and twenty-five thousand dollars, of which some twenty thousand dollars was realty, eighteen thousand dollars on deposit in the Planters National Bank of Richmond, and the balance represented by bonds, stocks, choses in action, and gold coin, deposited in a rented box in the vaults of the said bank. That on the 14th day of January, 1889, the county court of Henrico county, on the motion of the heirs at law of the said decedent, appointed William R. Quarles and Mann S. Quarles curators of the said estate, who immediately qualified as such, by giving bond in the penalty of three hundred thousand dollars, and entered upon the discharge of their duties. That on the 29th day of January, 1889, said Bettie Lewis, along with her husband, filed her bill in the chancery court of the city of Richmond against the aforesaid curators, in which she asserted that said William A. Thomas, deceased, during his last illness, by gift "*causa mortis,*" gave her the keys to the tin box in the vault of the Planters National Bank, above described, and with them all the property contained therein; that he gave her the pass-book, showing the status of his account with said Planters

---

* The able and learned brief of the appellees' counsel is not inserted because of its great length, and because its views were mostly sustained by the court.—*Reporter.*

Bank for money placed on deposit therein, and with it gave to her the balance on deposit to his credit in said bank, amounting, as aforesaid, to some eighteen thousand dollars; and that he also gave to her several negotiable notes, aggregating less than one thousand dollars, which he had with him at his residence at the time of his last illness. That to this bill the curators filed their joint demurrer and answer, denying the claim asserted by said Bettie Lewis; denying that said Thomas had attempted during his last illness to make a gift to the plaintiff of said property, and insisting that actual possession of the several subjects of this pretended donation had never come to or remained with the plaintiff; and that no possession, either actual or constructive, by her, at the joint residence of the donor and donee, could render valid the alleged gift, the same not being evidenced by deed or will. That on the 19th day of February, 1889, petitioner, Legh R. Page, was appointed administrator of the estate of said William A. Thomas, deceased, by the county court of Henrico county; and, as such, he filed his answer to the bill of said Bettie Lewis. Before the assets in the hands of the curators aforesaid could be turned over to petitioner, the chancery court of the city of Richmond, on the motion of Bettie Lewis, appointed N. W. Bowe and J. A. Coke receivers to take charge of and hold all of the aforesaid assets, pending a decision of the questions raised by the suit aforesaid. After the appointment of the aforesaid receivers, depositions were taken by both plaintiff and defendants, and the case made ready for a hearing at the June term, 1890, of the chancery court. The cause was argued, elaborately and exhaustively, before the Hon. E. H. Fitzhugh, the judge of the said court. No decree was, however, rendered by him, he having unexpectedly and suddenly died before the next term of his court. The Hon. W. J. Leake having been appointed his successor, the cause was again argued at great length before him; and on the 8th

day of January, 1891, a decree was pronounced by him, sustaining the claim of the said Bettie Lewis (as preferred in her bill) to all the personal estate of the said William A. Thomas, deceased, except the sum of eighteen thousand dollars, money on deposit in the Planters National Bank, which was awarded to petitioner, as administrator aforesaid. From this decree the case is here on appeal.

The question raised in the controversy and to be decided by this court is, what constitutes a valid gift *mortis causa ;* and whether the evidence adduced by the complainant comes up to the law's requirements to establish such a gift by the decedent, William A. Thomas, to the complainant, Bettie Thomas Lewis, by and through the facts and circumstances detailed in the bill and attested by the proofs ?

It is essential to a correct and just estimate of the facts of the case, as disclosed by the record, that they be viewed in the light of the history and relations of the parties to the controversy, the congruities of the case, and the legal weight of the testimony.

Bettie Thomas Lewis, who, before her marriage, was Bettie Thomas, is the only living child of the late William A. Thomas, a wealthy retired merchant, who, at the age of seventy years, and enfeebled by long sickness, departed this life, intestate, on the 4th day of January, 1889, at his residence in or near to the city of Richmond, possessed of a large estate of both real and personal property, but principally personalty. He never married, but cohabited with a woman of half white blood, formerly his slave, in the county of Pittsylvania, Virginia, by whom he was the father of two daughters, Bettie, and an older sister, Fannie, who married and died soon after the late civil war without issue. Bettie, thirty-five years of age when her father died, and Fannie were always recognized and acknowledged by William A. Thomas as his children ; they called him father, and he called them and cher-

ished and lived with them as his children. The death of Fannie was a great grief to him; and, after that event, his whole and devoted affection was centred upon Bettie as the "daughter of his heart and house," whom he loved "passing well," and from whom he was never thereafter separated, except for the two years that he sent her to a boarding-school. Soon after the termination of the late *war* he removed to Richmond to engage in business, and he purchased a small farm just outside the city limits for a home for himself and Bettie, and there they lived together for more than twenty years—*she* presiding at his table and over his household affairs, and ministering to him in sickness and in health, nursing and caring for him with the constant assiduities of a devoted and dutiful daughter; and *he* providing for her comfort and pleasure in every conceivable form that lavish paren·tal love and large means could suggest. He built the house in which they lived for her; and, according to her directions, he planned and furnished it. He occupied a room intercommunicating with Bettie's; and, during his long and languishing age, enfeebled by sickness and suffering, he preferred and tolerated no ministry but *hers* to his wants and his weariness. He provided for her an intelligent, agreeable, female living companion in his house until her marriage to John H. Lewis; and, for many years previous and up to his death, Fannie Coles, an educated, intellectual woman—the natural and recognized daughter of the late John S. Coles, of Albemarle county—was her household companion, friend, and room-mate. He urged Bettie to make a trip to Europe with him; and for eight or ten summers, next before his death, he visited *Saratoga Springs*, taking with him Bettie and Fannie Coles; and there, as at his own home, sitting and eating with them at the same table. For Bettie's mother he provided a home, where, for a time, she lived; but this he sold; and at the time of his death she lived at his house with Bettie, though the proof in the

record is that he did not, of late years of his life, cohabit with her. *William A. Thomas* is represented, by the witnesses of the appellants, as a man honest, just, close to his interests, unusually prudent, and of fine business capacity, simple and frugal in his habits. He is described by the witness, Dr. H. McGuire, who was his attending physician, chosen friend, and adviser, as " a peculiar character, anyhow. I think, too, he had some little superstition about making his will. I think it was a dislike that belongs to a great many men to provide for *death*—in any way." This "peculiar character, anyhow," cut off from social intercourse by the kind and circumstance of his household affinities, lived, insulated in his own home, almost absolutely without social recognition or intercourse. He had a few business friends, and no enemies. He had no relations of legal blood, except some collateral kindred, who had never visited him, in health or in sickness, and whom he knew of only by the importunity of occasional begging letters, of which he complained as an annoyance, saying : " Here is a begging letter. The only use my relatives have for me is to get all out of me they can ; but if they expect to get what I have when I die, they will be mistaken." Dr. McGuire says : " From some things he said to me, I don't know what, I had an idea that he did not like his relatives ; for I sometimes used these facts in urging him to make his will."

Mr. A. Judson Watkins, an adverse witness, (whose acts and *animus*, bearing upon this contest over William A. Thomas' dying dispositions, will be the subject of analysis further on in this opinion,) says : " I had a conversation with him (Mr. Thomas) on Wednesday evening (he died on Friday), which was the last I had, of about an hour's duration. I had frequently talked with him and persuaded him, with all the power that was in me, not to neglect further providing for Bettie, if he so intended." * * * " He did refer to Mr. Haxall's will, and I think he said, in course of conversation,

Opinion.

that he was very feeble, and that he wanted to see me, especially in regard to making some monied arrangement. And, furthermore, I think I remarked to him : ' If you were to die without a will the *lawyers* and *others* [what others ?] will get the most you have.' He followed me to the door and said to me, ' I am going to make everything all right.' " He did die, forty-eight hours after that interview, without a will ; and whatever may be the ultimate issue of the contest made by " *the others* " over William A. Thomas' large estate, the event will fully verify the other branch of Mr. Watkins' warning prediction !

Mrs. Sarah Phillips, a neighbor who lived the length of two city squares, and for twenty-one or twenty-two years, near Mr. Thomas, and who had been employed by him to teach his daughter Bettie, and who says that she saw a great deal of both of them, often and intimately, says : " I never heard him refer to his relations but once. He said that he had lately gotten a letter from one of them ; that he knew, from the style it was written in, what he wanted, and that was money ; that he never answered that letter, but rather shoved it off in the waste-basket ; that he (Thomas) had had to look out for himself since he was very young, and that others might do the same."

Mrs. Mary F. Boyd, a near neighbor and intimate of Mr. Thomas and his family for fifteen years before his death, whose husband, as a merchant, had business and personal relations with him, says : " I heard Mr. Thomas say, conversing with her husband about the property, ' Oh, William ! I have bought all my relatives off.' "

Mr. Stephen B. Hughes, the most intimate and trusted friend of Mr. Thomas, says : " I have known Mr. Thomas since 1850. We lived together in the same store for many years, occupied the same room together, and were partners in business for about three years. And these friendly relations

continued up to the time of his death." This witness, with
very much other testimony equally important in its bearing
upon the relations and affection existing between Mr. Thomas
and his daughter Bettie, says they were "of the most affec-
tionate nature—that of father and daughter. I have been
present when Mr. Thomas was sick, and I have seen for
myself. When Thomas was sick he usually sent for me. I
was, several years ago, sent for to see Mr. Thomas. I found
Thomas, as I thought, quite sick, and I asked Thomas to
allow me to send him a trained nurse, and he said 'No';
that he preferred Bettie to anybody else. It was during that
sickness that Thomas first told me that Bettie was his daughter.
It was during that spell of sickness that Thomas told me, at
his death, Bettie Lewis would be amply provided for. Some
three or four summers ago, when Mr. Thomas was making
his arrangements to go to Saratoga, I told him that I did not
think he ought to venture so far from home, as feeble as he
was, without having some one to care for him that he could
rely on; and he told me that he was going to take Bettie with
him; that he would rely on her sooner than any one else.
During his last spell of sickness Mr. Thomas frequently told
me of her kindness and attention, and believed, but for her,
he would not have lived to have gotten back from Saratoga.
Mr. Thomas told me that he was very feeble; his appetite was
poor, and he would rather be there with Bettie, because she
knew better how to care for him than any one else. He got
me to go and buy a trunk for her, and had her name marked
on it."

After stating that he had heard Mr. Thomas speak, more
than once, of his intention to provide amply for Bettie at his
death, he said : "*She* was the only one I ever heard him say
he was going to make provision for. Thomas used to get his
mail at our store, and I have heard Thomas remark, 'Here's
a begging letter,' or 'Another begging letter,' and the only

use his relations had for him was to get all out of him they could; but if they expected to get what he had when he died that they would be mistaken."

Fannie Coles, who was the bed-room companion of his daughter Bettie, and an inmate of his home and confidence for many years previous and up to his death, says that she never knew any of his relatives to be at his house, but did remember his handing to Bettie a begging letter, which he thought he had put in the waste-basket at Drewry's, but afterwards found a part of it in his pocket. She also remembered another begging letter (*Exhibit* " *A* "), as to which she says: " I have heard Mr. Thomas tell Bettie about this letter, and he took it and gave it to her, and told her he had nothing to send them, and that he had given them all he expected to give them, long years ago. And she said: ' Don't be so hard on the poor thing !' And he said to her: ' Bettie, if I left you alone, you and I would both go to the poor-house together, because there is no end to your giving, and I am not going to give them a cent.' "

There is, in the record, very much more testimony, equally strong, explicit, unimpeached, and uncontradicted, attesting the life-long, avowed, and unwavering solicitude and purpose of this isolated old man to nourish tenderly while he lived, and to provide for amply at his death, his devoted and faithful daughter Bettie—the only light of his long life, and the only love which quickened the emotions of his introverted and self-centred soul.

There is no particle of evidence—and none could be adduced by the appellants, aided by the direction of able, accomplished and assiduous counsel, and prompted by the large stake of the controversy—to prove that William A. Thomas ever declared or intimated an intention to provide for any of his collateral kindred at all; much less to allow them to take and enjoy the acquisitions of his long life of industry, thrift, frugality,

and self-denial.    But, while we are asked to deny judicial credence to the clearest, the most consistent, and convincing testimony, that this dying and devoted father did give, with all due and legal solemnities, the larger portion—not all—of his property to his only child and darling daughter, we are deliberately invoked to infer (without the slightest evidence to warrant the deduction, and in disregard of full, incontrovertible proof to the contrary) that it was William A. Thomas' dying design to leave his beloved, only child in destitution and disappointed helplessness; and to devolve, by the statute of distributions, his whole estate upon collateral kindred, with whom he had no intercourse, and for whom he cared nothing—*strangers*, absolutely, to his heart and his home. And the only inducement urged for this illogical and unwarranted inference is the circumstance that Mr. Thomas had the portrait of B. F. Gravely, who had married Mr Thomas' cousin; and that in a letter of condolence, dated March 2d, 1882, in reply to a letter announcing the death of B. F. Gravely, he expressed kindly regard, and asked Mr. Gravely's son, "Can I do anything for the family?"    The inference is, that he did *then* give them aid; and to this he doubtless had reference when he declared (as detailed in the evidence of Stephen B. Hughes, Fannie Coles, Mrs. Boyd, and sundry others) that he had given to them, long years ago, all he intended ever to give to them.

We have given this unavoidably long narrative of the relations, circumstances, congruities, and situation of the parties to this cause, to show that the avowed and constant object of Mr. Thomas' life, labor, and love was solicitude and provision for his daughter Bettie; and that there is not one scintilla of proof in the record that, through all the years of his life, and in all the references he ever made to his intended disposition of his property, he ever had in his heart or mind a purpose to provide particularly for any other than his cherished child; to

whom he was bound by the strongest ties of nature and affection; to whom he owed the undivided obligation of a father; and whose whole tenor of life, as shown by the record in this case, from her birth to the moment of his death, was an unvarying demonstration of dutiful devotion and filial confidence and affection.    During the long years of his declining health and " cold gradations of decay " there was no planning or plotting after property in her heavy heart; but, reposing in child-like confidence and disinterested trust in the love of her father, Dr. McGuire says, that when repeatedly warned and advised by him, (as often he had urged upon her father, on all the occasions of his critical illness,) that, if he should die without a will, the law would deprive her of everything, " she always seemed rather indifferent about it, and *was always more concerned about his health than his money !* "

The *factum* of the gift depends mainly upon the testimony of Fannie Coles, detailing the circumstances, actions, and accompanying statements of Mr. Thomas during the period of impending dissolution; and if that testimony be credible, consistent, uncontradicted, and corroborated by concomitant circumstance, it establishes, by legal and sufficient evidence, the gift, as a valid donation *mortis causa*, by William A. Thomas to the claimant, his daughter, Bettie Lewis.    Her testimony is very voluminous, and we will state only so much of it as is necessary to the conclusion.    She was subjected to the ordeal of four hundred and thirty-three searching questions and answers, and to a cross-examination, of many days, by a powerful array of practiced, skillful, able, and accomplished counsel for contestants—a fiery furnace of trial and a labyrinth of entanglement, through which she (nor any other human intelligence) could not have passed successfully, without the panoply of conscious truth and the thread of absolute consistency.

*Bettie Lewis* went upon the witness-stand, and offered to undergo the same process; but the appellants peremptorily

refused to let her testify; when, well they and their astute counsel knew that if (as argued and insisted now) there was a collusion of untruth and fraud between Fannie Coles and her, all that was necessary to catch and convict them was to let them both testify.

On Thursday, the 3d day of January, 1889, William A. Thomas was taken seriously ill, and he died in the early part of the night of Friday—the next day. It was during that illness that he made to his daughter, Bettie, the gift which is the subject of controversy in this case; and to which the chancery court of the city of Richmond, upon the evidence adduced, has solemnly adjudged she is entitled by law.

The witness, Fannie Coles, says: "Mr. Thomas called Bettie to his bedside and said: 'Bettie, I am a very sick man. I do not know what may happen.' And he said, 'Bettie, look into my pants pocket and bring me my keys, my pen-knives, my two purses; and look in the inside of my vest pocket and bring me a package of papers tied with a red string.' She brought them to his bed to him, and he said, 'Bettie, I am going to give you these things as yours.' He gave her the keys, to his top bureau drawer, and told her that in that drawer she would find two notes in a white envelope; to get these notes out of the drawer; that they were hers. Then he opened a small black purse, and took out a small package of white tissue paper. Out of this paper he took some keys, and he said, 'Bettie, here are the keys to my safe at Drewry & Co.'s and to the box I have in the vault of the bank.' He says: 'At Drewry & Co.'s, in the safe, you will not find anything of any great value, but whatever you find in that safe you can have. Now, Bettie, these keys that I now give you that belong to the box in the vault at the bank is where all my valuables are. Whatever you find in that box you can have as yours; and Bettie, whatever you do, don't let any one get these keys away from you on any pretense. Swing

on to them as you would your life.' Then he took up his
pocket-book and gave it to her, and told her it had no
great amount in the pocket-book, but that it was hers.
Then he took up the package of papers that was tied with a
red string, and he said : ' Bettie, in this package you will find
my bank-book, showing you how much I have in bank ; what-
ever it calls for you can have as yours, and in this package
also you will find some notes. They will be money for you ;
you can have them also. Bettie, I wish you to take these
papers, my purses, and my knives—I give you these knives
also—and put them in your trunk. I don't want you to put
them in my bureau, but put them between your' clothes for
safe keeping, for, Bettie, *you* will have to take care of these
things now. *I* have been taking care of them all these years
for you.' "

As to what occurred on the afternoon of Friday, the next
day, after Mr. Gilliam left, the witness further testified : " I
went up-stairs after seeing the gentleman (Mr. Gilliam) out,
that Dr. McGuire sent up, and knocked at Mr. Thomas'
door. Mr. Thomas spoke and said, ' Come in, Fannie,' and
said, ' Take a seat.' I said, ' No, sir, I thank you ; I don't care
about sitting down.' He said, ' Fannie, take that chair there
by the table.' I said, ' No, sir ; I don't care about sitting
down.' He said, ' Take that seat,' and I sat down. In a
minute or so a servant knocked at the door and said, ' Miss
Bettie, I have everything all ready for you now.' Bettie said
to him : ' Father, won't you have some lunch now ? It is time
you were eating something, as the doctor said you must eat
all you can.' She turned to me and said, ' Fannie, go down-
stairs and bring something nice up here for father's lunch.'
He turned to me and said, ' Fannie, keep your seat until I tell
you to go '; and he said to Bettie, 'I have something more
important to do than to eat, now.' Then he said to Bettie,
' Where are those things I gave you last night ?' and he said,

' I hope you have got them where I told you to put them, safe under lock and key.' Bettie told him, ' Yes, sir, she had; they were safe.' And he asked, ' Where were they ? ' and she told him they were safe. And he told her to go and get them and bring them to him. She turned to get them, and instead of putting them in her trunk, where he had told her the night before, she had dropped them in his bureau drawer. And he got very angry with her for putting them in his bureau drawer, and said to her, ' Look here, now, Bettie, you had better do as I tell you about these things I have given you, for your very life hangs on them, and the bread you eat.' Bettie brought the things and laid them on the table in front of him, and he turned to her and he said, ' Bettie, where is that white envelope with those two notes in it; get it out of the drawer and hand that here also.' Then he asked her and said, ' Bettie, where is your trunk at ? ' She said, ' In my room, behind the door.' He said, ' Now, Bettie, I want you to do for once in your life just as I tell you about these things.' Then he took the package of papers with the red string round, untied it, and he said : ' Bettie, I want to show these to you, and show you the importance of taking care of them.' He untied the envelope and took out his bank-book, and he says : ' Bettie, here is my bank-book, which shows you exactly how much I have in bank. I give you this book, and whatever it calls for you will find in the bank, and you can have the money.' Then he laid the bank-book on the table and took the notes out of the large envelope, and he says, ' Bettie, here's some notes which will be money for you also.' Then he picked up that white envelope and said, ' There are two notes in here which will be money for you also; I give these also.' Then he laid his hands on them and said, ' Bettie, these are yours, and you will have to take care of them.' Then he picked up a red pocket-book, and he said, ' Bettie, here's my pocket-book; you will find a little change in it; here, take it; keep

it, and take good care of it,' and laid it with the rest of his papers. Then he picked up his little black purse, and he says, ' Bettie, what I am going to give you now is of great importance and very valuable.' And he undid this little black purse and took out the keys, and said, ' Bettie, these keys belong to the safe at Drewry & Co.'s, and these which I hold in my hand,' he says, ' belong to the box which I have in the vault in the bank where all my valuables are.' He says : ' These keys open the safe at Drewry & Co.'s. You won't find anything of any great value in this safe, but what you find in there you can have ; it is yours.' He then handed her the keys of the safe, and says, ' Now, Bettie, these keys I now give you are where all my bonds, deeds, and valuable papers are.' He said : ' Bettie, these keys I want you to swing on to as you would your life. Don't let anybody get them away from you on any pretence. In that box, Bettie, in the vault, you will find everything valuable I possess in this world. Whatever you find, Bettie, you can have ; it is yours.' Then he handed her those keys and handed her the purse, and told her to be very careful to wrap those keys up in tissue-paper, as she found them. Then he gave her his pen-knives, and said that he set great store by them, and told her not to give them away to anybody, and to be careful not to let anybody steal them from her. Then he turned and tied these papers all together. He took the two purses and slipped them together between the red string and handed them to Bettie ; and I was sitting by the table, as I first told you, and he said to her, ' Bettie, I have given you everything I possessed in the world.' Then he said to me, ' Fannie, you see me give Bettie these things ? ' I said, ' Yes, sir.' Then he said to her, ' Bettie, you will have these things to take care of.' He said, ' Bettie, I am a sick man, and I don't know what may happen to me, and I have been taking care of these things all my life ; and, Bettie, you know how careful I am about my papers.

and keys; now you will have to do the same.' He said, 'Now, Bettie, I want you to take this package in your room and put it in your own trunk; raise your underclothes up and place them between your clothes. Lock the trunk and bring me the key here. Bettie, I want to see if your trunk key is a good one.' He took the two keys to the trunk and looked at them, and said, 'Yes, Bettie, they will do'; and he asked her had she strapped the trunk? She told him 'No, she locked it'; and he said to her, 'Bettie, are you crazy?' She said, 'No; that she thought locking the trunk was sufficient'; and he told her it was not sufficient, and to go back and strap it up; that he had given her all that he had in the world, and that if she didn't take care of it she would wind up in the poor-house. Then he turned to me and asked me again, and said: 'Now, Fannie, you have seen me give Bettie everything I possess in the world.' Then he turned to me and told me I could go; that he was through with me. And Bettie said to me, 'Fannie, go down-stairs to the store-room and get a bottle of that liquid bread, and take the cork out, and bring me a glassful up here for father.' I got the liquid bread, carried it up-stairs, and handed it to Bettie; she handed it to her father; he took a sip of it and, turned to me and said again to me, 'Fannie, you see me give Bettie everything I possess in this world, didn't you?' I said, 'Yes, sir; I did'; and he turned to me and said, 'Fannie, remember that, now,' and I said, 'Yes, sir.' And he told her to take special care of the trunk keys; and, whatever she did, not to leave that trunk open and let any one steal those things out of there that he had given her; and if she did, she would go to the poor-house, and to keep her trunk keys on her person day and night."

After the conversation last detailed by the witness, Thomas became much worse late on Friday evening, and Dr. McGuire was again sent for. He arrived at 8 o'clock that night, and

left a little after eight. Thomas grew rapidly worse after the Doctor left, and the witness, Fannie Coles, testifies that Thomas called Bettie and said to her: " Oh! Bettie, I am a mighty sick man—sicker than you have any idea about'; and he says, ' Bettie, where are those things I have given you?' She says, ' In my trunk, safe.' And he says, ' Bettie, where are your trunk keys?' And she said to him, 'I have got them in my bosom here.' And he said, ' That is right, Bettie; keep your keys on your person.' And he says, ' Bettie, make sure of it again; I have given you everything I possess in this world.' He says, ' Fannie, you hear me give them to Bettie again, don't you?' I said, ' Yes sir.' He says, ' Now, Fannie, remember.' And he said, ' Bettie, I am sicker than ever I was in my life.' And Bettie says, ' I shall send for the doctor.' He says, ' Oh! Bettie, I don't think he can do much good.' Then he turned to her, and he says, ' Oh! Bettie, remember now, I have given you everything'; and he turned over and complained of a severe pain in his side, and in a few minutes he was dead."

It is vehemently charged that the testimony of Fannie Coles as to the *factum* of the gift is false; that it is the result of a conspiracy with Bettie Lewis to defraud the legal distributees of William A. Thomas; that no such gift as she testifies to was ever made. The charge is easily asserted; but law, logic, and a decent respect for human nature all require clear and indubitable proof, to induce judicial credence to such an atrocity.

Why should this witness not be believed? Why should a court of justice, in the teeth of her clear, consistent, convincing, and uncontradicted testimony, *gratuitously* brand her as a perjured conspirator with *Bettie Thomas Lewis*, without a particle of evidence of either an uncontradicted or credible witness or a circumstance, simply because William A. Thomas, a dying father, with many years' infallible knowledge of her intel-

ligence and integrity, had called upon her, with his expiring
breath, to witness and attest the consummation of the life-
long solicitude of his heart, and his constantly declared pur-
pose to provide amply, at his death, for his cherished child ;
and, in a legal method, with parental piety, shed his parting
benefice and blessing on " a duteous daughter's head " ? Her
statements in evidence are consistent throughout. They are
natural, reasonable, and most probable, in themselves ; while
they are corroborated by the evidence of Dr. McGuire,
Stephen B. Hughes, the dying declaration of William A.
Thomas himself, and by all the concomitant circumstances of
the *res gestæ.* She is wholly unimpeached, in any of the ways
known to the law ; and her character for truth is as fair as
that of any other witness in the cause. She is the daughter
of a wealthy farmer in Albemarle county, and her mother
was a colored woman of mixed blood. She resided with her
father in his house, where he employed white persons to teach
her, till she was sent, at the age of thirteen years, to the Nor-
mal High School in Richmond for several years, when she
became a teacher in the public schools of Virginia for five
years or more, until, her health failing, she became the chosen
companion of Bettie Lewis in her father's house for many
years previous and up to his death. She was thirty years
old when she testified, and had lived in Virginia all her
life ; and she was subjected to a protracted and pertina-
cious cross-examination, which reviewed, with microscopic
and relentless scrutiny, her whole life, and which disclosed
no single circumstance affecting her moral character, or
discrediting her triple armor of truth. No material state-
ment of fact made by her in her testimony is contradicted by
any other witness. It is strenuously asserted that she is con-
tradicted by Dr. McGuire ; but this is neither just nor true in
fact. She says that when she went to Dr. McGuire's office on
Friday morning to let him know (as he had instructed the

night before should be done) the condition of Mr. Thomas, the Doctor inquired of her whether Mr. Thomas had made any will; that she told him he had not; that Mr. Thomas had given Bettie everything the night before; and that Dr. McGuire replied, "it was not worth a cent." Dr. McGuire does not remember Fannie's *then* telling him about Thomas having given his property to Bettie the night before; but, he says, "the conversation between Fannie and myself took place while a good many patients were waiting to see me; she may have stated it, though I am entirely unable to recall it; my memory is not very perfect about such things." The statement of Fannie Coles is positive as to what was said, while Dr. McGuire merely says he does not recall it; though he admits that, for the very sufficient reasons he gives, her statement may be true. But it is made obviously and undoubtedly true by what Dr. McGuire then immediately did and said. Soon after Fannie Coles left his office he went to see Mr. Thomas, and he says: "Bettie told me, after I got in the house, that her father had given her the keys, his bank-book, and papers, as far as I can recollect. I think she told me she had put them in the top bureau drawer. She told me he had given them to her; they were to be hers. I told her they were not worth a cent; that unless he made a will the law would give her nothing." Dr. McGuire had never conceived of a gift "*mortis causa*"; and therefore, in his oft-expressed solicitude for Mr. Thomas to provide for Bettie *by will*, he told Bettie, as he had told Fannie Coles in his office but an hour or two before, that the gift to Bettie was "not worth a cent; and that unless her father made a will the law would give her nothing." Fannie Coles testified before Dr. McGuire did, and she is corroborated by both the language and substance of Dr. McGuire's statement. And even if this were not so, it would be Dr. McGuire's mere failure of recollection; which happens daily in judicial investigations, with-

out giving rise to a suspicion of untruthfulness in the witness. Fannie Coles' testimony, in minute detail, of the making of this dying gift of his property by William A. Thomas to his daughter Bettie, is corroborated by Dr. McGuire's statement of what passed between him and Mr. Thomas in the chamber of death, within an hour of his last breath. Dr. McGuire had, in his mid-day visit to Mr. Thomas on Friday, told him of his extreme illness, and, for the last time of often-repeated admonitions to him, of the urgency and duty of his making his will to provide against leaving his daughter penniless, and to the tender mercies of his uncared-for collateral kindred; and he asked Mr. Thomas' consent to his sending to him a lawyer to write his will. Accordingly he had sent Mr. M. M. Gilliam out in the early afternoon of that day. Mr. Gilliam stayed only a few minutes—eight or ten, at most— and left the premises. Mr. Thomas became rapidly and alarmingly worse, and Dr. McGuire was summoned, and arrived upon the scene at about 8 o'clock that night, and left a few minutes thereafter, leaving directions as to what was to be done for Mr. Thomas that night. He states: "After that was finished I said to him, ' Has Mr. Gilliam been here ? ' ' Yes,' he answered, ' *that's all right, Doctor*,' with a wave of his hand, as if the matter was settled, and looked to me as if he expected me to approve of what he had said. I said to him, ' I am glad you have done it ; you have only done justice.' He then said, ' *You will be* very well satisfied (or perfectly satisfied) with what *I have done.*' "

What had this dying, devoted father "*done*" to repair his failure to convey the valuable city lots to Dr. McGuire as trustee for his daughter, and to build costly houses thereon, and to provide for her by will, when, with his expiring breath, he calmly and coolly assures Dr. McGuire's iterated, and over and over again reiterated, anxiety about provision for his daughter Bettie—" *That's all right*, Doctor ; you will be very

well satisfied (or perfectly satisfied) with what *I have done.*"
He meant—and could only mean—that he *"had done"* that
ample provision for his daughter that he always assured Dr.
McGuire he intended to make—not by will, but by giving
and delivering to her, on his death-bed, the bulk of his per-
sonal property, which was just as effectual and just as legal
as a will.

It is argued that Mr. Thomas did not make the gift
*mortis causa,* of his property, to his child Bettie, as dis-
tinctly and incontrovertibly proved, because of his oft and
emphatic statement of intention to provide for her by will;
and, time and time again, it is argued, that, in the eight or ten
minutes of Mr. Gilliam's presence with him alone in the death
chamber, only a brief time on Friday afternoon before he
expired, he made an appointment with Mr. Gilliam to go to
Mr. Gilliam's office the next day to have his will written.
Aside from the utter improbability—not to say impossibility—
of an enfeebled and dying old man, in the country, beyond the
limits of the city of Richmond, making an engagement, at 4
o'clock P. M., to arise from what proved to be his death-bed early
that night, and to come into the city and to a lawyer's office
the next day, *there is no evidence in the record of any such
purpose or possibility.* What passed between Mr. Thomas
and Mr. Gilliam, in those eight or ten minutes, we can never
judicially know. Thomas is dead; and Mr. Gilliam, one of
the counsel for appellants, has declined to testify in this case.
The appellants, by their cross-examination, elicited from Dr.
McGuire: "I think Mr. Gilliam told me, a short time after-
wards, that Mr. Thomas, in his interview with him, said there
were some papers that he wanted to get hold of, then out of
reach; and that he had postponed the making of his will until
the next day. I think he had an appointment with Mr. Gil-
liam for the next day. I think Mr. Gilliam said this." Both
this question and answer were objected to by the plaintiffs, as

illegal.   Mr. Gilliam's attitude of the Sphinx cannot be oper-
ated as hearsay evidence in this case, by any *Œdipus*, how-
ever respectable; and, howsoever important or interesting Mr.
·Gilliam's pregnancy of what occurred in that brief interview
with the dying man may be, he cannot be delivered by the
process of obstetrics, unknown to the science of the law.   If,
too, the field of conjecture be open, it is the most reasonable
supposition that, if Mr. Thomas did, in fact, want his will
written the next day, it was only for the purpose of devising
to his daughter, in addition to the personal property he had
given her, his valuable real estate; which he knew could not
be given except by deed or will.

While no witness testifies that Thomas ever said that he in-
tended to give his whole estate to his daughter, yet he fre-
quently declared his purpose to provide for her liberally.   And
no one ever heard him say that he intended to give anything
to any one else.   And the plain and positive proof is, that he
did not intend (but emphatically asserted to the contrary)
that his collateral kindred should have any part of " what he
had at his death."   To whom, then, but his daughter, must
he have intended his property to go at his death?   If he had
left her his *whole estate*, by a will, instead of the larger part
only by " *donatio mortis causa*," all just-minded persons
would have said, as Dr. McGuire's last utterance to him, " *you
have only done justice!* "

Mr. Stephen B. Hughes testifies:   " I was at Thomas'
house the night of his death.   I asked Bettie Lewis where
Mr. Thomas' keys were.   She said that she had them; that
her father had given them to her, and told her to lock them
up; that they were hers, and not to give them to anybody.
I heard Fannie Coles say that she was present when Mr.
Thomas gave Bettie Lewis the keys, and told her to lock them
up, and not to give them to anybody; that they were hers,
(Bettie Lewis, I mean); and took me into the back chamber

and showed me the trunk that they were locked up in." And this witness says that this fact, together with *what Mr. Thomas had previously told him were his intentions towards Bettie*, were his reasons for offering to deliver to Bettie the duplicate set of keys which he held. When Bettie Lewis told Dr. McGuire, (as she unquestionably did tell him,) on Friday, before he had seen Mr. Thomas, and just as he was about to enter Mr. Thomas' room, that her father had made the gift to her, she might reasonably have known that he would mention it to her father, as he was urging him to make a will; and it is impossible to believe, without contradicting all human experience, that she would ever have made this statement to Dr. McGuire, at the time and under the circumstances, if it had been false and fabricated, as alleged. These declarations of Bettie Lewis and Fannie Coles, as well as the declaration of Bettie Lewis to Mr. Hughes, are competent evidence, on both of two grounds—as part of the *res gestæ*, and as the declaration of a party in possession, and to rebut and repel the inference sought to be drawn from the testimony of the witness for the appellants, Watkins, as to the silence of Bettie Lewis, in respect to her claim, in her interview with him on Monday night next after Thomas died. It is vehemently insisted that her silence on that occasion, as to any gift made to her by her father, was equivalent to an admission that none had been made; that she had no claim, and pretended to none. Shall it be, in a court of justice, that she may not repel this inference by the testimony of Dr. McGuire and Stephen B. Hughes that she had, to them, on prior occasions, asserted her claim? If the silence of Bettie Lewis as to the gift, in her conversation with Watkins on Monday night, is a circumstance prejudicial to her claim, what is the significance of the assertion of her claim on Friday night before—the night that Thomas died—to Mr. Hughes; and to Dr McGuire on Friday morning, while Mr. Thomas was yet living? What she said

to Mr. Hughes was only in reply to his direct inquiry about the keys ; and Watkins did not, in that conversation on Monday night, ask her anything about the keys ; and she did not make any statement to Watkins, then, about the gift, because (it may have been) of *intuitive* distrust ; or because Dr. McGuire had told her, as he had told· Fannie Coles, that the gift " was not worth a cent." Dr. McGuire, as before stated, had never heard of such· a thing in law as a gift *mortis causa ;* and she, relying on Dr. McGuire's opinion, and not then having consulted any lawyer about the matter, there was no occasion for her to mention the gift in that conversation with Watkins.

Mr. Thomas was buried on Sunday. On the night of Monday (the next day) Watkins called to see Bettie, and he says that she did not then say to him that her father had given her his money, his bank-book, or other securities, or the key to his box· in the bank or his safe at Drewry & Co.'s, and that she did then say, as there was no will, she supposed that all she would have was the property held by me as trustee, and that she wished I would see Mr. Gilliam in her behalf. This statement, if true, has already been explained by what. Dr. McGuire and others had so impressively told Bettie Lewis would be her condition if her father died without a will. But is it not manifestly impossible for Bettie Lewis to have affirmed positively, as a fact in her knowledge, on Monday night, that Mr. Thomas had left " no will, and she knew it," when, then, there had been no opening or examination of Mr. Thomas' papers or places of safe deposit ? Dr. McGuire says : " Bettie Lewis certainly did not know *that* before the old man's death, for she and Fannie both told me that they didn't know whether the old man had made a will or not when Mr. Gilliam was there." Bettie Lewis has been peremptorily denied the privilege of testifying in this case, notwithstanding· the great concern she has at stake ; and simple justice demands that the statements of this witness (Watkins) for the appel--

lants should be tested by all the touchstones of truth—*proba-bility* and *consistency*—which are the fixed standards of evidence. Out of the mouth of this witness himself the record shows that he involves himself in flat and flagrant *self-con-tradictions;* but, first, his attitude and *animus* in the case are manifested by his interview with Bettie Lewis on Thursday night next following. He says: " I told Bettie Lewis that I had been to see Mr. Gilliam for her, and stated the case to him the best I could, and he said it was impossible to make a case of it, and that he was sorry he could not do something for her. She said it made no difference ; that she had employed other counsel—viz., Judge Waddill, Judge Christian, and Edgar Allan. She then said she was very much obliged to me for seeing Mr. Gilliam for her. I said to her *I had nothing but her interest* at stake, and that I would be glad to know *exactly what Mr. Thomas said to her in his last moments*. Fannie Coles, who was sitting near by, said : ' Bettie, Judge Christian told you not to talk to any one on the subject.' I said : ' If such are your instructions, I certainly don't want to hear anything about it.' " By this, Mr. Watkins' own version, it appears that, after Bettie Lewis had told him she had confided her case to the counsel of her choice, he, adroitly and artfully prefacing his question with the professing of his disinterested solicitude for her interest at stake, asked her to *tell him* " *exactly* what Mr. Thomas said to her in his last moments." The object of this attempt is obvious enough ; but, by the significance of Mr. Watkins' attitude in this case, as disclosed by the record, it is made perspicuously plain. Fannie Coles' account of this interview, in response to the 287th cross-question, shows that Mr. Watkins used importunity and expostulation in his endeavor to induce Bettie Lewis to let him " know *exactly* what Mr. Thomas said to her in his last moments " ; and that it was not until he had been repeatedly denied and thwarted in his

attempt that he said (if, indeed, he said it at all), " If such are
your instructions, I certainly don't want to hear anything
about it." Fannie Coles says : " Mr. Watkins came out there
one night, and asked Bettie about her father giving her the
keys. Her reply was to him : ' Mr. Watkins, I do not care
to talk on that subject at all.' Mr. Watkins turned to me
and said : ' Fannie, don't you think Bettie ought to tell me
all about the keys, for *I am just the same to her* as her
father ?' I said : ' Mr. Watkins, I don't know anything about
that. She has her lawyers, and she ought to do as they told
her to do.' And Mr. Watkins said : ' Now, Fannie, you know
there is nothing in the world that I would not do for Bettie.'
I said : ' You and Bettie can suit yourselves about the matter.
I have no more to say.' *Mr. Watkins again asked her.* She
said : ' Mr. Watkins, I do not care to talk on that subject
to-night.' And I remember now, as you mention the subject,
that Mr. Watkins said to her : ' Bettie, I only came out here
to-night to find out all about those keys.' " The record shows
that this witness, who professed that he had nothing but
Bettie Lewis' interest in view, and who had promised Mr.
Thomas (as he says), on the 16th day of February, 1878, " I
will do the very best for her as long as I live," and who
undertook to see Mr. Gilliam for the purpose of stating " her
case " to him, and of seeing whether he " could make a case
of it," was, a day or two after, if not at the very time, he was
inviting Bettie Lewis' confidence on the ground of his fatherly
interest in and for her, actually conferring with Mr. Thomas'
next of kin, and entertaining a proposition to be appointed
one of the curators, which only failed because Mr. Pace
(Page) objected to going his security ; and that, although he
averred his intimate knowledge of Mr. Thomas' affairs, yet
he refused to tell what he knew when requested so to do by
Bettie Lewis' counsel. And this witness (except a Mr.
Gravely, who knows nothing) is the only witness who has

been found to defeat the fully-attested claim of Bettie Lewis to her father's bounty. He fixes *Monday* night next after Mr. Thomas' death as the date he was out at Mr. Thomas' house, by the fact that he went there to see an insurance policy, and *he was certain* he saw the policy there *that night ;* and he swears that *he is certain* that he saw Clay Thomas there that same evening ; yet he swears that it was *on Thursday* night that he went to see, and did see and examine, the policy ; and that it was on *Thursday* night that he first saw Clay Thomas there. This is the unenviable attitude of this the only witness to support the contest of Mr. Thomas' collateral kindred, and to defeat his dying disposition of the bulk of his personal property.

The testimony and the circumstances relied on by the appellants to show that no such gift was made by Mr. Thomas as sworn to by Fannie Coles and attested by corroborating facts, do not, we think, furnish a sufficient basis for even reasonable conjecture ; much less to assure the guarded discretion of a court of justice. The circumstance that there is but one direct witness to the gift competent to testify (the appellants declining to allow the donee as a witness when offered) does not affect the validity of the gift. One witness, if credible, is sufficient ; the law does not require more than one ; and, especially, as in this case, when that one is not only unimpeached, but corroborated. Nor does the magnitude of the gift affect its validity ; it may extend to the whole of the donor's personal estate ; the law fixes no limit. In the case of *Duffield* v. *Elwees*, 1 Bligh. N. S., the gift *causa mortis* was of the value of $165,000. In *Hatch* v. *Atkinson*, 66 Maine 327, the court says : " The common law does not require the gift to be executed in the presence of any stated number of witnesses ; nor does it limit the amount of the property that may thus be disposed of." White & Tudor's L. C. in Equity, Vol. I., Part II., 1251 ; Schouler's Per. Prop., Vol. II., 132, 136.

The *factum* of the gift in this case, being clearly and con-clusively proved, as, we think, it indisputably has been, it only remains to state the law and apply it to the facts proved. They show all the essential attributes or constituent elements of a *donatio mortis causa*, as defined by the law and established by the course of adjudication. The gift was made *in periculo mortis*, under the apprehension of death as imminent; and it was of personal property, such as, under the law, may be the subject of a gift *mortis causa*. Possession or delivery was made at the time of the gift; and the donor died of that illness in a few hours after the making of the gift; thus the gift, inchoate, conditional, and defeasible when made, became absolute at the donor's death. Delivery is essential; it may be either actual, by manual tradition of the subject of the gift, or constructive, by delivery of the means of obtaining possession. Constructive delivery is always sufficient when actual, manual delivery is either impracticable or inconvenient. The contents of a warehouse, trunk, box, or other depository may be sufficiently delivered by delivery of the *key* of the receptacle. *Jones* v. *Selby*, Prec. Ch. 300 ; *Ward* v. *Turner*, 2 Vesey 431; *s. c.*, 1 Lead. Cases Equity 1205 ; *Jones* v. *Brown*, 34 N. H. 445 ; *Cooper* v. *Burr*, 45 Barb. 10 ; *Penfield* v. *Thayer*, 2 E. D. Smith 305 ; *Westerlo* v. *Dewitt*, 36 N. Y. 341; *s. c.*, 93 Amer. Dec. 517 ; *Ellis* v. *Secor*, 31 Mich. ; *s. c.*, 18 Amer. Rep. 178 ; *Hildebrant* v. *Brewer*, 6 Texas ; *s. c.*, 55 Amer. Dec. 757 ; *Elam* v. *Keen*, 4 Leigh 333 ; *Stephenson* v. *King*, 81 Ky. 425 ; *Lee's Ex'or* v. *Boak*, 11 Gratt. 182.

Many cases were cited by the appellants. In some of them it did not appear that there was any *intention to give;* while in others the *delivery* of possession was not complete—the donor intentionally retaining control or dominion. In the cases of *Miller* v. *Jeffress*, 4 Gratt. ; *Lewis* v. *Mason*, 84 Va. ; *Yancey* v. *Field*, 85 Va. ; *Rowe* v. *Marchant*, 86 Va., there

was no delivery whatever, either actual or constructive. The delivery of the keys to Bettie Lewis, with words of gift by her father upon his death-bed, invested her with the same means of obtaining possession that Thomas had; and made her the owner, with title defeasible only by recovery or revocation of the donor, or by a deficiency of assets to pay creditors; and the mere existence in Stephen B. Hughes' hands of a duplicate set of keys, for precaution against loss or accident, which he had no right or authority to use, did not impair the validity of the gift which he did make to his daughter, in his last moments, in the most unqualified manner; and, being thus invested with lawful ownership, the law, in case of refusal by the officers of the bank, would open the doors to her.

It is contended that the gift was *testamentary*, because of the words in the affidavits of Bettie Lewis and Fannie Coles, "*were hers in case of his death*"—"*to be hers in case of his death.*" The affidavits were prepared by counsel, and certified by the notary, as a predication for the appointment of receivers; and they were not intended, and could not be regarded, as evidence; and they do not purport to give the language of the affiants, nor to state the language and actions, in detail, of Mr. Thomas in making the gift. But, even if Mr. Thomas had used the very words, " to be hers in case of his death," it would have been but expressing in terms the very definition, substance, and form of a gift *mortis causa*, as given by all the law-writers and adjudged cases; that it is conditional, defeasible—not to be absolute and irrevocable unless and until the death of the donor from the impending peril under the apprehension of which the gift was made. Bouvier L. Dict., "*Donatio mortis causa*"; 1 Abbott's L. Dict. 402; 2 Jacobs' L. Dict. 307; 3 Pomeroy's Equity, § 1146; 2 Schouler Per. Prop. (2d edition), chap. 5, § 135; *Parish* v. *Stone*, 14 Pick. 198; *s. c.*, Amer. Dec. 378;

*Grover* v. *Grover*, 24 Pick. 261; s. c., 35 Amer. Dec. 319;
*Gans* v. *Fisk*, 43 Ohio State 462; s. c., 54 Amer. Rep. 819;
*Taylor* v. *Henry*, 48 Md. 550; s. c., 30 Amer. Rep. 490.
The cases in which gifts made in similar and identical lan-
guage, by dying donors, have been held to be valid donations
*mortis causa* are numerous—the principle being, that the
expression, "in case of my death it is yours," or like words,
do not, of themselves, make a *testamentary* disposition, but
merely express the condition which the law annexes to every
donation *mortis causa*. *Snellgrove* v. *Bailey*, 3 Atk. 214;
English Notes to *Ward* v. *Turner*, 1 Lead. Cases in Equity
1222; *Ashbrook* v. *Ryan*, 2 Bush. 228; *Grymes* v. *Hone*, 49
N. Y. 17; s. c., 10 Amer. Rep. 313.

In the case of *Sterling* v. *Wilkinson*, 83 Va. 791, the gift
was made more than three years before the donor died, and
was not made in view of death impending; and the donor
actually did retain and exercise control over the subject of the
gift by disposing of so many of the bonds as were necessary
to indemnify his endorsers. In the case of *Basket* v. *Hassell*,
107 U. S., the decision turned alone on the construction and
legal effect of the endorsement upon the certificate by the
donor: "Pay to Martin Basket * * *—no one else—*then not
until my death.*" This was held to be a testamentary dispo-
sition; but in the opinion of the court Mr. Justice Matthews
says: "The certificate was payable on demand; and it is
unquestionable that a delivery of it to the donee, with an
endorsement in blank, or a special endorsement to the donee,
or without endorsement, would have transferred the whole title
and interest of the donor in the fund represented by it, *and
might have been valid as a donatio mortis causa.*"

It is contended that the gift by Thomas, in this case, was
invalid, because it comprised the bulk of his estate. The *jus
disponendi* is the essential value and element of property; and
the exercise of that right is commended in the beatitude, "It

is more blessed to give than to receive." By the law of Virginia a person may make a dying disposition of all of his personal property, *donatio mortis causa ;* and there is no limit as to the extent of the gift—whether of the whole or of the part—*inter vivos,* or *donatio mortis causa.* Such limitation can only be by express legislation ; and the courts are invested with no such function. The Roman or civil law of "*donationes mortis causa*" did recognize the limitation or restriction ; but the *common law* does not limit the amount—absolute or comparative—of the personal estate which may thus be disposed of. *Michener* v. *Dale,* 23 Penn. S. R. 59; *Seabright* v. *Seabright,* 28 West Va. 481 ; *Hatch* v. *Atkinson,* 66 Maine 327 ; White & Tudor L. C. in Equity, Vol. I., Part II., 1251; Schouler's Per. Prop., Vol. II., 132--'6.

It is contended that the gift in this case comes within the operation of the section 2414 of the Code of Virginia ; and, as the donor and donee resided together at the time of the gift, possession by the donee at the common place of residence was not sufficient ; and, for that reason, the gift must fail. The section is : " No gift of any goods or chattels shall be valid, unless by deed or will, or unless actual possession shall have come to and remained with the donee or some person claiming under him. If the donor and donee reside together at the time of the gift, possession at the place of their residence shall not be a sufficient possession within the meaning of this section." In the construction of statutes the general rule is, that the words used in the statute are to be construed according to their natural and ordinary popular and accepted use and meaning, unless it plainly appears that it was intended by the legislature to give to them a different, special, and extraordinary meaning. All the law-writers use the simple term " *gift,*" when used without qualification, to express the " *ordinary gift* " or "*simple gift,*" which transfers an absolute and irrevocable title to the donee, as contradistinguished from

the extraordinary and technical gift "*mortis causa*," which is made under the apprehension of impending death, and transfers only a conditional, defeasible, and revocable interest. The peculiar gift "*mortis causa*" is always designated by its special, technical name; and it is never understood or intended to be embraced or expressed by the term "*gift*" merely. A gift "*mortis causa*" is a very different thing from a "*gift*," in many essential particulars. Chancellor Kent, 2 Comm., Lecture XXXVIII.; 2 Schouler's Per. Prop. (2d edition), sec. 64.

The policy of the section (2414) originated in 1757, and again in 1758, and in 1787, in the Revised Code of 1819, in the Code of 1849, and in the Code of 1887; and in none of these enactments is the special, peculiar, and distinctive, technical descriptive phrase, "*gifts mortis causa*," to be found. The mischief intended to be guarded against in the policy of the statute was as to gifts *inter vivos ;* and, until 1849, it was applicable only to gifts of *slaves.* Then it was made to embrace all "goods and chattels"; but it would violate both reason and analogy to hold, that, in its new, any more than in its ancient form, it would embrace gifts *mortis causa.* It is an established rule of construction, that the existing law is not intended to be changed unless such intention plainly appear; and the inference is irresistible that the legislature did not intend to abrogate the common law of "*donatio mortis causa*," without having, expressly and by proper descriptive legal language, said so. 11 Gratt. 242–'3; 21 Gratt. 695; 6 Randolph 149, *Durham* v. *Dunkley.*

The disposition of personal property by "*donatio mortis causa*" has been a principle and practice of the common law, both in England and in the states of this Union, for centuries past; and although, since the day of Lord Hardwicke, there have been extra-judicial utterances in deprecation of it, it is, to-day, a fixed principle of enlightened jurisprudence in all

civilized countries. It is the imperative function of the courts to interpret and operate the law *as it is*—not as they may think it *ought to be*.

In the able and elaborate opinion of Judge Leake, filed with the record in this case, he decided (saying, " but certainly not without doubts "—" the question to my mind is a very doubtful one ") that the gift by Mr. Thomas of his bank-book, showing the amount of his deposits in the Planters National Bank, was ineffectual in law as a *donatio mortis causa* of the money to his credit in the said bank ; and he decreed accordingly.

In this, I am of opinion, the decree under review is erroneous ; and that it should be, under the rule, in this particular, corrected in favor of the appellees, and in all other respects affirmed ; but the majority of the court think the decree is wholly right, and that it must be affirmed as it is.

Every species of personal property, in its largest sense, capable of delivery, actual or constructive, may be the subject of a valid gift *mortis causa*, including money, bank-notes, stocks, bonds, notes, due-bills, certificates of deposit, and any other written evidence of debt. *Lee's Executor* v. *Boak*, 11 Gratt., and cases there cited ; *Elam* v. *Keen*, 4 Leigh 333 ; Lead. Cases in Equity, Vol. I., 1205 ; *Duffield* v. *Elwees*, 1 Bligh. N. R. 497 ; *Grover* v. *Grover*, 24 Pick. 265. In the case of *Coleman* v. *Parker*, 114 Mass. 33, it is said : " This term ' *delivery* ' is not to be taken in such a narrow sense as to import that the chattel or property is to go literally into the hands of the recipient and to be carried away. There are many articles which might be made the subjects of a donation *mortis causa*, in which a manual delivery of that kind might be inconvenient or impracticable. We have no doubt that a trunk, with its contents, might be effectually given and delivered in such a case by a delivery of the key. * * * " In the case of *Cooper* v. *Burr*, 45 Bar-

bour 9, it is said : " The situation, relation, and circumstances
of .the parties and of the subject of the *gift* may be taken
into consideration in determining the intent to give, and the
fact as to delivery. *A total exclusion of the power or means
of resuming possession by the donor is not necessary.*" In
*Elam* v. *Keen*, 4 Leigh 335, Judge Carr said : " There are
many things of which actual, manual tradition cannot be
made, either from their nature or their situation at the time.
It is not the intention of the law to take from the owner the
power of giving these. It merely requires that he shall
do what, under the circumstances, will in reason be consid-
ered equivalent to an actual delivery." In *Hatch* v. *Atkin-
son*, 66 Maine 324, the court said that delivery must be as
complete " as the nature of the property would admit of."
See *Wing* v. *Merchant*, 57 Maine 383 ; *Dale* v. *Lincoln*, 31
Maine 422; *Hildebrant* v. *Brewer*, 6 Texas 45; *Noble* v.
*Smith*, 2 John. R. 52 ; *Jones* v. *Brown*, 34 N. H. 445 ; *Marsh*
v. *Fuller*, 18 N. H. 360.

In *Stephenson* v. *King*, 81 Ky. 425, (*s. c.*, 50 Amer. Rep.
172, 177,) the court, referring to the case of *Ashbrook* v.
*Ryan*, as to the bank-book, says : " What evidence the pass-
book contains of the deposit in that case does not appear. If
.an ordinary pass-book (and it must be so inferred), it was an
acknowledgment by the bank that the donor had to his credit
in the bank that much money ; and, when actually delivered,
we cannot see why it did not pass the right."

Suppose Mr. Thomas, instead of having certificates of
deposits, made and entered by the bank in his bank-book, had
taken a separate receipt or certificate of deposit for each
deposit at the time it was made ; would not the delivery, with
words of gift, of each one of such receipts or certificates of
deposit, have been as effectual in law to pass the title to his
money in bank, as the delivery of the *letter*, in *Stephenson* v.
*King;* or the *attorney's receipt* for claims in his hands for
collection, in *Elam* v. *King?*

Mr. Thomas' bank-book had just been written up or balanced by the bank, and it showed on its face the balance due to him by the bank. It was the bank's acknowledgment of indebtedness to Thomas, and the only voucher or evidence which he had, upon which the law implies a promise to pay; and it was transferrable by delivery without writing, like any other *chose in action.* It passed the equitable title, and that is sufficient. The " *beneficial owner* " of *any* chose in action may sue upon it in his own name. Sec. 2860, Code of Va. 1887. There is a difference between a savings bank pass-book and an ordinary bank-book; in that, by a special method and agreement, on the mere presentation of the savings bank pass-book, the bank will pay; but this is the mere special mode of dealing agreed on by the parties in that case; and though the bank would have the right to require evidence to satisfy it that Mr. Thomas had duly delivered, with words of gift sufficient in law to transfer his title to his money in the bank to his donee, Bettie Lewis, his daughter;' yet that would not, any more than in the case of the keys, affect her title and right to demand the money, which the law would enforce.

This case was first argued before Chancellor Fitzhugh, and submitted for his decision; but he died in a few days, leaving nothing to show what conclusion he would have reached *upon the facts.* He had (as it appears by what is stated in the petition for appeal) noted down a few platitudes or propositions. of law, which (no more than if he had copied the *Decalogue*) do not afford the slightest clue as to what he would have decreed *upon the facts*, under the law.

We have given to this case elaborate consideration and the closest scrutiny; and, upon the law and the facts, our judgment is to affirm the decree of the chancery court of the city of Richmond.

Lewis, P., (concurring) said:

I concur in the opinion that the decree of the chancery court ought to be affirmed, and add a few words to what has been said by the court, only because of the reliance for the appellant upon the case of *Yancey* v. *Field*. It has been asserted that that was a case of a gift *mortis causa*, which this court refused to sustain because of its want of compliance with the statute now carried into section 2414 of the Code. In other words, that this court in that case construed that statute as applying to gifts *mortis causa.*

There is no warrant whatever for such a proposition.

In the first place, it was not claimed that the alleged gift in that case was a gift of that description. On the contrary, it was distinctly claimed as a gift *inter vivos*. The petition filed in the lower court, after stating that Judge Field died indebted to Yancey, further averred as follows:

" Your petitioners further represent that the said James P. Yancey, a short time before his death, gave to your petitioner, Edmonia, the indebtedness to him by the said R. H. Field, she, the said Edmonia, being a niece of the said James P. Yancey; that the bonds evidencing said indebtedness could not be delivered, as they had been filed with the commissioner in the said suit of *Yancey* v. *Field*. And your petitioners insist that they are, by virtue of the said gift, entitled to the said indebtedness, and to have the said debts endorsed for their benefit."

The same counsel who prepared this petition argued the case for the appellees in this court, and both in his oral and printed arguments he insisted that the alleged gift was valid as a completed gift *inter vivos*. In his brief, filed with the record, he said: " The testimony proves not only the gift, but that it was a completed gift *inter vivos*." And again: " In the case at bar there is no claim by virtue of a nuncupative

will or other testamentary act. *From the very first the gift was claimed as an act inter vivos.*"

It will thus be seen that the case was presented to the lower court and to this court as a gift *inter vivos*, and as such it was dealt with. As the appellees themselves admitted that there had been no delivery of the subject matter, that, as the court said, was decisive of the case, whether viewed as an intended gift *inter vivos* or *mortis causa ;* and this was all that was necessary to the decision of the case. Reference, however, was made in the opinion to some of the general principles of the common law relating to gifts, and to the difference between the two classes of gifts, attention being especially called to the necessity of a delivery in all cases. And as illustrative merely, or rather to call attention to the fact that the common law requirement of delivery in case of a verbal gift had been incorporated in our statute law, the statute was referred to.

The court, however, did not say the statute was intended to apply to gifts *mortis causa*, for no such question, as we have seen, was before the court, and, therefore, the expression of any opinion on that subject would have been purely *obiter*. This, indeed, is so obvious from the opinion itself that I ought, perhaps, to beg pardon for adding anything to what has been said in the opinion of the court in this case.

LACY, J., (dissenting) said :

As appears from the opinion of the majority of the court, this is a suit to enforce against the administrator of a dead man's estate an alleged gift of the whole estate, amounting to over $200,000, which alleged gift is claimed to have been made by the decedent in disregard of all of his heirs and distributees, his next of kin, a few minutes before his death, to a colored woman living in his house, who claims to be the result of illicit intercourse with a colored slave woman.

It also appears from the opinion of the majority that the alleged gift consisted of goods and chattels in the house, and goods and chattels out of the house, where the alleged donor and donee resided together. The claim is that the goods and chattels in question were, as to certain keys, pocket-book, and two pocket-knives, actually delivered into the donee's possession. That money, &c., in a bank vault, and money, &c., in an iron safe, and money on deposit in bank, subject to check, were symbolically delivered by the delivery of the keys and the pass-book of the bank, in which deposits were entered. It is not pretended that there was any further delivery than such as I have mentioned, either as to the thing delivered or the manner of its delivery. So that, *if everything was done in manner and form as this woman Lewis alleges, then the gift was made by the donor to the donee at their common residence,* with delivery of possession of keys as to the great bulk of the property given, and not actual delivery. Let us consider first whether the goods and chattels in question could pass from the donor to the donee in this way and become the property of the donee.

Our statute laws provide general rules as to the creation and limitation of estates, and their qualities and the manner of making valid gifts is regulated by the law from the earliest times of which we have any account. The law has, to a greater or less degree, thrown some protection around the estates of dying men, and provided safeguards against the perjuries and frauds employed by the designing to obtain the possession of the estates of the deceased person. Of these I will speak briefly hereafter.

It is profitable to consider first what are the regulations to be found in the Virginia law prescribing general rules as to the creation of estates.

It is provided by law in this state that, " *No gift of any goods and chattels shall be valid, unless by deed or will, or*

*unless actual possession shall have come to and remained with
the donee, or some person claiming under him. If the donor
and donee reside together at the time of the gift, possession at
the place of their residence shall not be sufficient possession
within the meaning of this section.*" Code of Virginia, section
2414, chapter 107, page 591.

It must be admitted (it cannot be denied) that Thomas and
Bettie Lewis were domiciled together. It is also distinctly
proved that they did reside together at the time of the alleged
gift. It is equally true that no actual possession ever came
to Bettie Lewis of any important part of the large estate said
to have been given to her, and that there was no possession of
any sort except such as may be construed to pass with the
key to the bank-vault box and iron safe, of which another
person had a duplicate key, and with the pass-book of the
bank. The pocket-knives and some notes were actually de-
livered into Bettie Lewis' hand, but even this was at their
common domicile where they resided together. This statute is
conclusive of the case, unless in some way it can be avoided.
This is attempted to be done by the assertion that this statute
does not apply to this kind of gift; that this statute was
made to protect creditors and to prevent fraudulent acts, by
way of gifts falsely alleged to be made, from defrauding
creditors of their just debts, and that a gift of this sort does
not affect creditors. But there is no language of this sort to
be found in this section, nor in this entire chapter. It does
not treat of the rights of creditors as against the claims of
fraudulent alienees. Chapter 109 of the Code treats " of acts
valid between the parties, but void as to creditors and pur-
chasers." This chapter, as its title declares, prescribes gen-
eral rules as to the creation and termination of estates and
their qualities. Section 2414 enacts a general rule as to all
gifts, and prescribes what shall be necessary in order to create
an estate in goods and chattels by a valid gift; and declares

all gifts not so made invalid. "No gift of any goods or chattels shall be valid unless * * *." This is an alleged gift, alleged to have been made by a donor to a donee, when donor and donee resided together at the time of the alleged gift.

The word "gift" is not limited, but is used in its full signification. If this term does not include this kind of gift, what word could be used to describe it? If the statute was intended to apply to gifts *inter vivos* only, why is the word "will" in the statute? Gifts *inter vivos* are not given by will; a will takes effect at the death of the testator. A gift *inter vivos* is not, cannot be, bestowed by will. It may be by deed or by actual and complete delivery of possession, so as to cut off and determine the possession, control, and dominion of the former owner; otherwise it is incomplete, and, being without consideration, cannot be enforced. A will is the appropriate method to give gifts to take effect after the death of the testator or donor; bequests and legacies are allowed and enforced against the executor or persons entitled without a will.

If a will is not made, then there is allowed by the law a gift, which has certain characteristics and attributes, appropriately signified by the words *mortis causa.* Among other things, it is revocable by the recovery of the sick man from the impending peril which threatened him. But it is well settled that, like all other gifts, and, as a gift, it must be completely given and actual possession consummated, so as to cut off the possession, control, and dominion of the donor—interrupt his possession just as completely as is necessary in all gifts. In other words, the same sort of delivery of possession is necessary in the one case as in the other. In this respect there is no difference between gifts, whether *inter vivos* or *mortis causa.* And when the kind of possession is prescribed by statute, that sort must be given or there is no gift; the attempt is abortive, and the gift is invalid. I do not see any reason in construing this statute to limit the meaning of the

word "gift" to one kind of gift only. The word applies to both kinds. The reason of the law applies, as we well know, to the one as well as to the other. The statute has never been otherwise construed, but has been often construed in this state, and always in the same way, and I will cite the cases, and there are none *per contra* until this.

There is only one other state in the Union which embodies this statute in its code of laws, the state of West Virginia, and there this statute has been construed, and construed in accordance with the Virginia decisions. *Dickeschied* v. *Bank*, 28 W. Va. Rep. 340. It is there considered that the principal object which the legislature had in view in the passage of the law as it stood in the Code of 1849 was to protect the estate of decedents from the rapacity of unscrupulous attendants residing with and constantly surrounding them, and to prevent them from appropriating to their own use the slaves or other personal property belonging to the alleged donor. And just in proportion· as his personal property was valuable, and of a character to be readily appropriated, was it the more necessary that, when claiming as a gift, the actual possession of the property should be required to come to and remain in good faith with the alleged donee. Where the donee resides with the donor so many opportunities of unfair dealing may be found, and so many temptations to commit perjury may exist, the legislature determined to render the same impossible by declaring that "no gift of goods or chattels should be valid unless actual possession shall have come to and remained with the donee, or some person claiming under him. And if the donor and donee reside together at the time of the gift, possession at the place of their residence shall not be sufficient possession within the meaning of this section."

The delivery of everything which is claimed to have been delivered in this case is invalid under this statute. The

money, stocks, bonds, &c., were never delivered at all, actu-
ally or otherwise.    But it is said that keys were actually
delivered, and that the stocks, bonds, &c., were given, and
were not at the place of the common residence of donor and
donee, and so were not affected by the statute.    The answer
to this is that delivery is necessary, and here there is no
delivery.    If the delivery of the keys symbolized the valua-
bles, the symbolical delivery was incomplete and invalid, and
if the keys and pocket-knives were not validly given, then
there was no gift, for nothing else is alleged to have been
given.    One of the learned counsel who argued this case here
by brief insists that "it would be absurd to suggest that a
delivery of keys and a pocket-book, as representative or
symbolical of the gifts, would be valid gifts of chattels, and
that the chattels themselves, if delivered as the symbols were,
would be invalid and ineffectual."    That would defeat the
object and destroy the spirit of the statute.    That would
make the shadow more potent than the substance.    Just here
let us consider what becomes of the symbol itself in such a
delivery of possession, for the symbol in this case was a key,
a chattel, and that was the thing delivered, if anything was
at " the place of their residence."    I think it is clear that the
reason, as well as the letter, of the law applies equally to
every species of property alleged to be the subject of the gift.

This section first came into our law in the Code of 1849,
where sections 2413 and 2414 of the present Code were
embodied in section 1 of chapter 116.    And the words, " if
the donor and donee reside together at the time of the gift,
possession at the place of their residence shall not be sufficient
possession within the meaning of this section," first then
appeared in our law.

The Code of 1849 was not like its predecessors—a compila-
tion of revised statutes—but an act of assembly, one of the
chief objects of which, as expressed in the preamble to the

act, was to arrange the subjects under *appropriate titles;* and the title of chapter 107 of the present Code is a copy of the title of chapter 116 of that Code; so the legislature there declared that this section prescribed pre-requisites to a valid gift, and declared that to be the object of its enactment; and the revisors have preserved the same language in the preamble to the present Code, to arrange them in appropriate titles, &c.

The learned lawyers who revised and codified our laws appended to this section a note referring to the decisions construing this section, most of the marginal references being to decisions found in the Code of 1849, and decided, therefore, before the enactment of the law in question. The note is as follows: " *Donatio mortis causa.* 4 Gratt. 472; 11 Gratt. 182; 23 Gratt. 342; 107 U. S. 602."

The first case referred to by the learned lawyers who composed the board of revisors, as appropriate to this section, as to what is necessary to render valid donations *mortis causa*, is the case of *Miller* v. *Jeffress*, in 4 Gratt. That was a controversy over an alleged gift to the donee of bonds which the alleged donor held against him. The court rejected the claim of the donee. In that case Judge Allen said : "As the witnesses examined to prove the alleged donation vary somewhat as to the precise words used by the decedent, the certificate written and signed at the time, and referred to and recognized by the witnesses when giving their testimony, can be more safely relied on as showing what did actually occur than the recollection of the witnesses after so great an interval." The certificates and the depositions vary in this case, as I will hereafter show.

Judge Allen said further: " The words themselves import a future benefit, * * * imply not a present donation, but a future enjoyment. The words were that 'his friend Jeffress should have all the bonds of his in his possession.' Viewing the words as clearly testamentary, that they were so

intended, and. not as importing any present gift or parting
with dominion over the thing, I am of the opinion [says Judge
Allen] the appellee is not entitled to claim the bonds as a
donation *causa mortis.*"

In the same case Judge Baldwin said, in delivering the
opinion of the court : " The court is of the opinion that the
appellee, Jeffress, has shown no right to the bonds assigned to
and placed in the hands of Jeffress & Co., (of which firm he
was partner,) by Paschal Folkes, deceased, the subsequent
parol gift to said Jeffress, under which he claims, having
never been perfected by delivery, which was not the less
essential to its validity because the gift was in the donor's last
sickness, and in contemplation of approaching death. A
*donatio mortis causa* is of a mixed character, being partly
testamentary and partly donative; from an indulgence to
the nature of the emergency, the law dispenses with the
solemnities of a testament, and for that very reason requires
the essentials of a gift."

I will pause here to ask what are the essentials of a gift in
this state ?   My answer is, they are prescribed in section 2414
of the Code, *supra,* by deed or will, or by actual possession
delivered to the donee, and, if the donor and donee reside
together, possession at the place of their residence is not suffi-
cient.

Judge Baldwin says further : " A delivery is indispensable to
the validity of a *donatio mortis causa.*   It must be an actual
delivery of the thing itself, as of a watch or a ring, or of the
means of getting the possession and enjoyment of the thing,
as of the key of a trunk or a warehouse in which the thing is
deposited ; or, if the thing be in action, of the instrument by
using which the chose is to be reduced into possession, as a
bond or a receipt, or the like.   *   *   *   It is the naked case
of an abortive nuncupative will, which the disappointed lega-
tee is now seeking to convert into a *donatio mortis causa.*"

In the case of *Lee's Executor* v. *Boak*, 11 Gratt. 185, Judge Moncure said : " Whether the donation was valid or not depends upon whether there was a sufficient delivery of possession to perfect the gift. *All gifts*, except by will, must be attended by delivery of possession to make them valid. Until such delivery they are inchoate and revocable—indeed, mere nullities. The donation in this case, as found by the jury, was a *donatio mortis causa*. But there is no difference in this respect between donations *mortis causa* and *inter vivos*. The same kind of delivery of possession which is necessary to make good the one is necessary to make good the other."

And in the case of *Morrison's Executor* v. *Grubb*, 23 Gratt., Judge Anderson, delivering the opinion of the court, when speaking of the delivery of possession of a gift, says : " And it matters not whether it was a gift *causa mortis* or *inter vivos*."

In a recent case in this court, *Yancey* v. *Field*, 85 Va. 756, the statute concerning gifts, which I have been considering, came up for consideration. The case was an alleged *donatio causa mortis*. The circuit court had sustained the gift, but this court, for want of compliance with the requirements of the statute, section 2414 of the Code of Virginia, as to delivery, reversed the trial court, and refused to sustain the gift, with reluctance, it being stated in the opinion : " This conclusion, however, has been reached not without reluctance. Had we the authority to execute the alleged gift, or, in other words, to give effect to the manifest intention of the decedent to aid this worthy lady, the court, without hesitation, would affirm the decree ; but we have no such authority. Our province is not to make the law, but to administer it, and we must, therefore, decide this case according to the settled law as it is written, and not permit a hard case to make bad law." * * * Blackstone says : "A true

and proper gift is always accompanied with delivery of possession, and takes effect immediately." 2 Comm. 441. Citing *Ward* v. *Turner*, 2 Ves. Sen. 431, and quoting from and citing *Basket* v. *Hassell*, 107 U. S. R. 602, says: "Indeed, we have a statute which expressly enacts that no gift of any goods or chattels shall be valid unless by deed or will, or unless accompanied by actual possession, and that if the donor and donee reside together, possession at their residence will not suffice." Code, section 2414.

It is, however, *now* decided in this case that this statute, so expressly quoted and held by the unanimous opinion of this court in *Yancey* v. *Field* to render a gift *mortis causa* invalid, has no application to such an alleged gift.

I am of opinion that the words of the statute clearly and unequivocally apply to all gifts. "No gift shall be valid unless," is equivalent to "every gift shall be invalid unless"; and, as there was no delivery of possession, actual or otherwise, claimed, except at the common residence of the alleged donor and donee, this supposed gift is invalid. So the law is written.

The decision here must rest upon the assertion that a gift *mortis causa* is not a gift—that is, that the word "gift" does not apply to a gift with a particular motive. The words of the statute are general, and include all gifts, and they have been so distinctly held in this court up to this case.

A gift is the voluntary transfer of a thing without consideration—a transfer of the title to property to one who receives it without paying for it.

This case was first considered in the chancery court of Richmond by the late chancellor, Edward H. Fitzhugh, who died before decree in the cause, but not before he had partially written his opinion, and such was his eminence in his profession that his opinions have, upon appeal here, been several times adopted by this court in full, as the best exposition of its opinion that could be made of the law of the subject, and

recorded as the opinion of the appellate court; and I have turned to his opinion to see what was his construction of the particular question upon which I think this case should be determined—the delivery of possession set forth in the testimony. Judge Fitzhugh says, among other things: "The question in this case is whether the gift set up in the plaintiff's bill has been maintained as a valid gift *causa mortis,* under the law and the evidence, so as to confer a title to the property, the subject of the gift, to the donee. As was justly observed by one of the counsel in argument, the statute of descents and distribution has long been held as a wise and just and natural disposition of a man's property, if he chooses to die intestate. If he thinks proper to make a different disposition of his property than that prescribed by law in case of intestacy, he is at liberty to make a will. Our statute of wills can fully guard him against imposition in his dying hours. A man may make a gift *causa mortis,* but, for obvious reasons, the courts are extremely guarded and cautious in the establishment of such gifts. Every reason which the wisdom of the law deems to be necessary to establish a will applies with equal, if not greater, force to the establishment of a gift *causa mortis;* and because of the opening which this mode of transfer affords to fraud, the law watches it with jealousy, and does not permit it, with its attendant uncertainties, to take the place of a will. It is apparent, if these remarks are sound, that the court should require the clearest proof of the donor's intention to make the gift, and of every requisite necessary to make a valid donation *causa mortis—one of these requisites is delivery.*" And the learned chancellor, after quoting extensively from the case of *Yancey* v. *Field, supra,* recently decided here, says: " This, I think, is a sound exposition of the law. It conforms to the policy of the law, which watches this mode of transfer of property with so much caution and jealousy; and, moreover, it seems to be the view which our Supreme

Court of Appeals has taken of it, and which is therefore binding on this court" (chancery court of Richmond city). In view of these extracts, it cannot be doubted what his decision was to be in this case.

Mr. Minor, in his third volume, speaking of the mode of perfecting the gift of a chattel between *donor and donee* (referring to a separate head—the mode of perfecting a gift of chattels as to third parties), after referring to actual delivery, or its equivalent, when the thing was incapable of actual delivery, as a pre-requisite to a valid gift, says: "The donor must part not only with the possession, but with the dominion of the property." Says further, at page 81: "Much embarrassment having arisen when the donor and donee lived together (as, for example, in the case of father and child) in respect to what should be a sufficient delivery of the possession, it has been judicially enacted that ' if the donor and donee reside together at the time of the gift, *possession at the place of their residence* shall not be sufficient possession within the meaning of this section.' "

It was decided in this court in *Shirley* v. *Long*, 6 Rand. 764, that a parol gift of a slave to a son by father, when they resided together, was void as between the donor and donee, for want of actual possession. See also *Hunter* v. *Jones*, 6 Rand. 541; *Slaughter's Adm'r* v. *Tutt*, 12 Leigh 147; *Tutt* v. *Slaughter's Adm'r*, 5 Gratt. 364. This is a case of the validity of the gift between the parties, which is not valid as between them—that is, is no gift—unless delivered in the mode prescribed by law.

I think this is conclusive of this case, but the learned chancellor who rendered the opinion appealed from has sustained the alleged gifts as to all, except the alleged gift of the bank deposit, by delivering the pass-book. As to this pass-book, I think he was right; as to all else, wrong. There was no valid gift under the law of anything. I do not con-

sider it necessary to review the evidence, therefore, to sustain my view, as, admitting all that is claimed to be true, the gift was invalid for want of delivery; but I do not mean to concede that all that is testified to appears to me to be credible. It is an alleged gift of everything the donor possessed. This is the claim. Who was the donor? An infirm sick man, advanced in years. At his bedside was the alleged donee, a colored married woman, acknowledged to be his child by the donor—no longer young. At her elbow another colored woman, which latter is the sole witness to prove the gift of this large estate, who, with much detail, recites the circumstance of the gift; no other person was present, no other witness was called in, although others were in the house. The gift is not of a trifle, or a competency merely, but of everything the donor had in the world. What are the circumstances that tend to discredit this sweeping gift of everything the donor had in the world?

First. The donor had an intimate friend, who had been chosen by him (the donor) to hold certain property for the alleged donee, and to whom he had conveyed certain lots in Richmond, in trust for the alleged donee, and to whom, in a long intimacy, he had often spoken concerning this woman, and to whom he had said that a large bequest to the donee in her situation would do her no good. When the trustee called, after the donor's death, the donee said Thomas had made no will; she supposed she would get nothing except what he held in trust for her. · When the story of the keys, &c., was noised abroad, he called to enquire about it, and asked the donee about it, and expressed his interest in her  The *single witness,* who was again at her elbow, cautioned her to say nothing on the subject, alleging that this was the advice of her counsel.

Secondly. It is also shown that Thomas, the donor, was negotiating with another gentleman, and had procured his consent to act as trustee, to hold other property for the donee,

about the time of his death.   So that he appears to have considered a trustee necessary to hold and protect such property as he should give her.

Thirdly.  It is also shown that at the time of his death he had consulted with a lawyer about making his will, and had an engagement to attend at the lawyer's office the next day after his death, to make his will.   This lawyer was spoken to by the trustee of the donee to attend to her interest to establish this gift, or concerning it, but declined upon the ground that she had no case.

Fourthly.  Although Thomas, the donor, as the evidence shows, was in the habit of talking a good deal about his property and his disposition of it, yet there is no person to whom he ever, before his gift, mentioned such an intention as giving all of his property to this woman, while Mr. Watkins, a witness, says he expressed a contrary purpose.

Fifthly.  He had relatives with whom he was on good terms, and one of whom he was especially fond, whose portrait hung over—always over—the mantel in the room where he slept ; and a letter from him is exhibited by a relative, written by Thomas to enquire the full names of certain relatives of the deceased.

These circumstances stand not conclusively disproving the evidence of the single witness, but they do not render it any more probable.   Moreover, the affidavit filed at the commencement and first assertion of the claim set up a gift testamentary in character, to be effected only after the death of the donor (*Basket* v. *Hassell*, 107 U. S. R. 614; *Sterling* v. *Wilkinson*, 83 Va. Rep. 791) ; whereas, in her deposition, she, the single witness, leaves out all that indicates a postponement of the effectual delivery of the gift to the death of the decedent. The case alleged in her deposition is an absolute gift of everything the donor had, completely given, and the whole detail gone over more than once.   If the law does not favor such

gifts, as it does not, then in strictness this gift is not established by the testimony of one inconsistent witness.

I forbear comment upon the policy of the law which permits such gifts at all, on the dying-bed, but will refer to the remarks of Mr. Schouler in his treatise on the law of personal property, Vol. II., pp. 182, 183, 184, and the cases there cited, especially the views of Lord Eldon in *Duffield* v. *Elwees*, 1 Bligh. N. S. 533.

In Virginia, I have heretofore thought that the character of delivery required by our statute would sufficiently protect the dying man; but if there is no statute concerning the kind of delivery necessary to pass a dying man's estate on his death-bed by gift, then our statute of wills appears to be useless. This question is of no importance, so far as creditors are concerned—such gifts do not affect them or their debts; but the next of kin, and distributees, near in blood or remote, are all concerned. One child against another, or one child against grand-children—all may rest at the mercy of attendants. It opens wide the door for fraud and perjury, and I think Lord Eldon was right when he said : " Improvements in the law, or some things which have been considered improvements, have been lately proposed; and if, among those things called improvements, this donation *mortis causa* were struck out of our law altogether, it would be quite as well." " And at the present day [says a learned author above mentioned], when the effort to carry out the giver's intention has resulted in encouragement to a giver to leave his deliberate intention in lasting doubt, when legal consistency seems to require reluctant courts to uphold a nurse, in sole attendance upon some foolish person, in carrying off stock, bonds, and promissory notes, with little or more ado than floor-sweepings or waste paper, utterly regardless of the claims of kindred, it is no wonder that we find the reports full of judicial regrets that the gift *causa mortis* was ever admitted into our law at all."

Schouler 184; *Walsh* v. *Sexton*, 45 Barb. 251; *Tilling-hart* v. *Wheaton*, 8 R. I. 356. "It is far better that a gift of this kind occasionally fail, than that the rules of law be so relaxed as to encourage fraud and perjury." *Hatch* v. *Atkinson*, 56 Me. 324.

I feel constrained to dissent from the opinion of the other judges, for the foregoing reasons.

RICHARDSON and HINTON, J's, concurred in the opinion of FAUNTLEROY, J.

DECREE AFFIRMED.